**In re EQUITY FUNDING CORPORA-
TION OF AMERICA SECURITIES
LITIGATION.**

**No. M.D.L.–142–MML.**

United States District Court,
C. D. California.

Sept. 29, 1977.

ATTORNEYS (PETITIONERS):
Schwartz, Alschuler & Grossman and Corinblit & Shapero, Los Angeles, Cal.; Wolf, Popper, Ross, Wolf & Jones and Kreindler & Kreindler, New York City; David B. Gold, San Francisco, Cal.; Feinerman, Furman & Klein, Beverly Hills, Cal.; Milberg & Weiss, New York City; Kohn, Savett, Marion & Graf, P. C., and Fine, Kaplan &

Black, Philadelphia, Pa.; Sachnoff, Schrager, Jones & Weaver, Ltd., Chicago, Ill.; Kass, Goodkind, Wechsler & Gerstein, New York City; Diamond, Tilem & Colden and Irsfeld, Irsfeld & Younger, Los Angeles, Cal.; Bader & Bader, New York City; Joseph A. Ruskay, Woodmere, N. Y.; Nemser & Nemser and Phillips & Mushkin, P. C., New York City; State Teachers Retirement Board of Ohio, c/o Attorney General of Ohio, Columbus, Ohio; Arter & Hadden, Cleveland, Ohio; Shatzkin, Cooper, Labaton, Rudoff & Bandler, New York City; Katz, Hoyt & Bell, Los Angeles, Cal.; Samuel Sebba, London E. C. 2, England; McDermott, Will & Emery, Chicago, Ill.; Kirsch, Arak & Bulmash and Frieman, Rosenfeld & Zimmerman, Beverly Hills, Cal.; Steinhaus & Hochhauser, Lake Success, N. Y.; Pryor, Cashman, Sherman & Flynn, New York City; James Chapman and Much, Shelist, Freed, Denenberg & Ament, P. C., Chicago, Ill.; Phillips, Nizer, Benjamin, Krim & Ballon and DiFalco, Field & Lomenzo and Demov, Morris, Levin & Shein, New York City; Chapman & Cutler, Chicago, Ill.; Bachner, Tally & Mantell, New York City; Alvin B. Green and Jones, Day, Reavis & Pogue, Los Angeles, Cal.; Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va.

1. For example, during the hearing on these fee applications, Mr. David Gold filed exhibits which consisted of numerous articles from various publications, including The New York Times, The Wall Street Journal, the San Francisco Chronicle, The Los Angeles Times, Barron's, and Fortune magazine. Gold Exhibits 11 and 11A. Many of these articles spawned the initial rash of lawsuits relating to the fraud at EFCA.

2. *See, e. g.,* R. Dirks & L. Gross, The Great Wall Street Scandal (1974); R. Soble & R. Dallos, The Impossible Dream. The Equity Funding Story: The Fraud of the Century (1975).

3. Pursuant to § 167(3) of the Bankruptcy Act, 11 U.S.C. § 567(3), the Trustee for EFCA in reorganization proceedings under Chapter X of the Act filed an exhaustive report pertaining to fraud, misconduct, mismanagement, and irregularities at EFCA. This report included the results of a fraud audit done by one of the leading accounting firms in the United States, Touche Ross & Co. *See Report of the Trustee*

## MEMORANDUM OPINION AND ORDER DIRECTING PAYMENT OF ATTORNEYS' FEES AND COSTS

LUCAS, District Judge.

After a duly noticed evidentiary hearing during the two days of May 10 and 11, 1977, the Court is prepared to fix and direct the payment of attorneys' fees in this class action securities litigation.

## I. BACKGROUND FACTS

The history of this multi-district, securities litigation has been well-documented in the press,[1] in books,[2] in special reports,[3] and in numerous judicial opinions.[4] It would be imprudent as well as impossible to repeat in this short space what has consumed volumes; however, before making an evaluation and award on the fees requested, a brief review of the history and nature of this litigation is in order. While a detailed history of this case is unnecessary, some background information is essential to an understanding of the Court's conclusions that follow.

The litigation arose out of a massive securities fraud perpetrated through Equity Funding Corporation of America (hereinafter "EFCA") and its subsidiaries. In March, 1973 more than eight years of public

*of Equity Funding Corporation of America,* filed October 30, 1974, in the reorganization proceedings, and filed in this Court on January 16, 1976, as an Exhibit to the Affidavit of Edmund H. Kerr in Support of Plaintiffs' Motion for Partial Summary Judgment.

4. *See In re Equity Funding Corporation of America Securities Litigation,* 416 F.Supp. 161 (C.D.Cal.1976); *In Re Equity Funding Corporation of America,* 396 F.Supp. 1266 (C.D.Cal. 1975); *In Re Equity Funding Corporation of America Securities Litigation,* 396 F.Supp. 1277 (Jud.Pan.Mult.Lit.1975); *In Re Equity Funding Corporation of America Litigation,* 391 F.Supp. 767 (Jud.Pan.Mult.Lit.1975); *In Re Equity Funding Corporation of America,* 391 F.Supp. 768 (C.D.Cal.1975); *In Re Equity Funding Corporation of America Securities Litigation,* 385 F.Supp. 1262 (Jud.Pan.Mult.Lit.1974); *In Re Equity Funding Corporation of America Securities Litigation,* 375 F.Supp. 1378 (Jud.Pan.Mult. Lit.1974).

trading in EFCA securities was halted by the New York Stock Exchange and the Securities and Exchange Commission. Soon thereafter, in an action brought by the SEC in the Central District of California, EFCA consented to a decree enjoining the continuation of the scheme to defraud investors.

Following numerous press reports in April, 1973 disclosing the fraud at EFCA, numerous investor suits were filed throughout the country. More than 110 class action complaints and more than 15 private actions were filed relating to the alleged EFCA fraud.[5] The majority of these actions were filed either in the Central District of California or the Southern District of New York.

Although these actions were based on the same underlying set of operative facts, the complaints and the theories for recovery they contained were as diverse as the parties and counsel who pressed the actions. The list of defendants totaled more than 260 and included EFCA, its officers, its inside and outside directors, the accountants, investment banking firms which acted as underwriters, a host of tippee defendants who allegedly sold after learning of the EFCA fraud, New York banks, brokerage houses, the New York and American stock exchanges, and the Illinois and California insurance departments.

A characterization and classification with exactitude of all the original claims in this litigation would be impossible; however, the Judicial Panel on Multidistrict Litigation (hereinafter "the JPML"), in its opinion consolidating and transferring these actions to this Court, fairly and accurately described the claims as follows:

"A. *Primary or Underlying Fraud Claims*

The primary or underlying fraud claims relate to an alleged scheme by Equity Funding and its subsidiaries to inflate assets and earnings by, among other things, creating and selling to reinsurers bogus life insurance policies in order to present to the investing public an image of a successful, growing and prosperous enterprise. The alleged fraud, facilitated by the use of computers, enabled Equity Funding to overstate its assets and record non-existent assets, which eventually appeared in its financial statements. The defendants in the fraud actions typically include Equity Funding, its officers, directors and subsidiaries, and its accountants and auditors who prepared the financial statements and reports which concealed the alleged fraud.

"B. *Trading or So-Called 'Tippee' Claims*

These claims are asserted by purchasers of Equity Funding's securities against parties who allegedly possessed material, non-public information concerning Equity Funding and traded in the securities of the corporation without making such information generally available to the investing public. Plaintiffs typically allege that in March, 1973 a former Equity

---

**5.** EFCA had almost 10,000 shareholders, who had purchased approximately $500 million worth of securities in the corporation. Although much of this belonged to individual investors, many private institutions lost in the millions of dollars. For example, the EFCA trustee estimated that aggregate losses of over $65 million represented the common stock losses of the following institutions alone:

| | |
|---|---|
| $1,238,000 | Teachers Retirement Board of New York |
| 7,337,000 | State Teachers Retirement Board of Ohio |
| 433,000 | Gulf Oil Pension Plan |
| 728,000 | Board of Pension of the Lutheran Church |
| 9,617,400 | Solomon Bros. |
| 392,000 | Central Pension Fund |
| 959,000 | Wisconsin Alumni |
| 1,229,000 | Oppenheimer Fund |
| 3,517,000 | Dreyfus Fund |
| 4,834,000 | Ford Foundation |
| 1,650,000 | Collective Mutual Fund |
| 1,215,000 | Cleveland Trust |
| 3,473,000 | Commonwealth Edison Annuity |
| 198,000 | Hanover Square Associates |
| 355,000 | Bear Stearns |
| 317,000 | Edwards & Hanly |
| 14,953,000 | Morgan Guaranty |
| 816,000 | Northwest Airline Pilots |
| 12,605,000 | Lawton General |
| $65,866,400 | |

Funding employee informed a securities analyst for a research oriented brokerage firm that a massive fraud was being perpetrated at the company; that the analyst conducted his own investigation and passed information he gathered to certain investors and agents for investors in Equity Funding's securities; and that those in possession of this inside information used it to their advantage until trading in all securities of Equity Funding was suspended. Plaintiffs also necessarily allege the facts of the primary or underlying fraud.

Some of the complaints which contain trading or 'tippee' claims name as defendants not only parties which allegedly traded securities when in possession of inside information but also party-defendants to the primary fraud claims.

"C. *Combination Primary Fraud-Trading Claims*

Some of the complaints contain a single claim for relief based upon allegations of both primary fraud and trading on inside information.

"D. *Underwriting Claims*

These claims are asserted by purchasers of debentures of Equity Funding and focus upon the financial statements in the separate registration statements and prospectuses disseminated with respect to the public offerings of the debentures. The claims necessarily contain allegations to the underlying fraud at Equity Funding.

"E. *Rescission Claims*

Claims for rescission and damages are made arising out of Equity Funding's acquisition of Bankers National Life Insurance Company and Liberty Savings & Loan Association. Plaintiffs were stockholders in the corporations at the time of the acquisitions and received Equity Funding stock in exchange for their shares. They allege that the financial statements used by Equity Funding in connection with the acquisitions were false and misleading. But included in plaintiffs' claim for rescission are allegations concerning facts relevant to the primary fraud.

"F. *Miscellaneous Claims*

. . . . .

2. *Indenture Trustee Actions*

■ Independent Investor Protective League has filed two actions in the Southern District of New York against the indenture trustees of the Equity Funding debentures, alleging that the trustee violated its fiduciary duties to protect the rights of the bondholders. Plaintiff is opposed to transfer of either of the actions. The complaints on their face, however, raise questions of fact common to the other actions and we find that these parties will to some extent benefit from participation in the coordinated or consolidated pretrial program in California.

3. *Broker-Dealer Actions*

■ Individuals who purchased Equity Funding securities before trading was suspended have filed actions against their brokers and representative agents alleging violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. These actions necessarily involve the primary fraud at Equity Funding and, in order to eliminate the possibility of duplicative discovery and inconvenience to the parties and witnesses, they should be transferred to the Central District of California and placed under the general supervision of the transferee judge."

*In re Equity Funding Corporation of America Securities Litigation,* 375 F.Supp. 1378, 1381–82 (Jud.Pan.Mult. Lit.1974), (citations omitted).

Prior to the consolidation and transfer of the claims to this Court pursuant to the above-quoted opinion, groups of counsel in New York and California attempted to organize their respective aspects of the litigation. Counsel in each city met and elected Steering Committees. Pursuant to pretrial orders entered in this Court and the Southern District of New York, attempts were made to draft unified and consolidated complaints. Plaintiffs in California filed a sin-

gle unified and consolidated complaint containing requests for definition of four separate classes encompassing the primary fraud, trading or tippee, underwriting and rescission claims. These same efforts at coordination among New York counsel resulted in the filing of four separate consolidated class action complaints.[6] It is clear that the delayed action of the JPML and the inability of California and New York counsel to agree upon a unified approach caused much duplication of efforts and waste of judicial resources in the beginning of this litigation.

The polarity of positions between New York and California counsel was evidenced in the proceedings before the JPML. Plaintiffs' Steering Committee in California embraced the belief that consolidation and centralization of all cases in one location was vital to the successful prosecution of the litigation. The trading plaintiffs and other New York plaintiffs, as well as certain defendants, pressed for bifurcation of the action and argued that at least the trading and underwriter cases should remain in the Southern District of New York.

The respective positions were exhaustively briefed and argued before the JPML on two separate occasions.[7] After lengthy oral argument, the JPML in a 5 to 4 decision filed February 1, 1974,[8] ordered all EFCA cases transferred to the Central District of California, including the underwriting and trading cases. The centralization of the cases in California prevented the possibility of overlapping and inconsistent class determinations, the duplication of discovery and the possibility of conflicting district court and appellate court decisions being applied to the litigation.[9]

After the consolidation and transfer of the litigation, efforts to coordinate the proceedings were doubled. Recognizing the reality that the New York cases were being sent to California, all counsel set out to organize the separate plaintiffs' committees into one unified committee of counsel. This was accomplished by expanding the membership of the California Plaintiffs' Steering Committee, which then included Messrs. Marshall Grossman, Jack Corinblit and David Gold, to include Messrs. Philip Jones, Paul Bernstein, Stuart Wechsler, Leon Gold, and Herbert Wachtell, all of New York, Mr. Harold Kohn of Philadelphia, and Mr. Lowell Sachnoff of Chicago. The primary responsibility for organizing the prosecution of this litigation was, thereby, placed in the hands of these counsel.

6. The JPML described the four complaints as follows:
 "(1) A unified consolidated class action complaint on behalf of trading class.
 (2) A unified consolidated complaint in class actions brought on behalf of former stockholders of Bankers National Life Insurance Company.
 (3) A unified consolidated complaint in underwriting class actions.
 (4) A unified consolidated complaint in fraud and miscellaneous class actions."
 375 F.Supp. at 1383, n.10.

7. The JPML held the first hearing in San Diego in June, 1973 and held a second in New York City on September 28, 1973.

8. An initial Order transferring the actions was issued by the JPML on December 11, 1973.

9. Even counsel who spearheaded the opposition to the transfer has admitted that
 "Of course, with the benefit of hindsight, there is no question that the pretrial proceedings in all phases of this litigation have been expeditiously, efficiently, and successfully conducted by this Court and the leadership of ⸜

plaintiffs' Steering Committee." Affidavit of Paul M. Bernstein, page 8.
Other counsel are more adamant in their belief that the decision to transfer all actions contributed immeasurably to the effective litigation and ultimate settlement of the case.
 "It is highly unlikely that the instant settlements would have been achieved at all—or within the present time frame—without the success of their efforts to bring all of the cases to California." Joint Affidavit of Marshall B. Grossman and Jack Corinblit, page 10.
 "In short, the decision of the Judicial Panel on Multidistrict Litigation transferring all *Equity Funding* cases to this Court was a key victory for *all* plaintiffs. It resulted in the establishment of one central committee of plaintiffs' attorneys which now began to work toward a common goal. Without the centralization of power in one location, the management of the litigation and its settlement would have been severely hampered." Application of David B. Gold for Reasonable Attorneys' Fees, page 11.

Immediately after the Order of the JPML, the Court noticed a status conference which was held on December 20, 1973. The result of this status conference was the issuance by the Court of an Order staying all proceedings in all actions in "M.D.L. Docket 142," the docket number given to all EFCA cases. The purpose of this stay was to prevent pell-mell and haphazard discovery and to permit the physical transfer of the files from numerous jurisdictions.[10] This stay also allowed counsel to organize themselves and their litigation strategy.

By order, dated May 21, 1974, the Court undertook the convening of a preliminary pretrial conference. This order established June 17, 1974 as the date for the preliminary pretrial conference and listed ten items as an agenda. Among the items set on the agenda was consideration of "consolidated proceedings versus coordinated proceedings" (including the type of complaint to be used; the establishment of pleading deadlines; and discovery procedures.)

At the conference on June 17, approximately 110 attorneys participated, and a considerable number availed themselves of the opportunities provided by the Court to file written memoranda both before and after the hearing.

This hearing resulted in the issuance of "General Management Order No. 1" and "Practice and Procedure Order No. 1." The major features of these orders included the establishment of a single organization of plaintiffs' counsel rather than separate organizations for class action counsel and private action counsel; a separate organization of class action counsel for the sole purpose of preparing motions under Rule 23 of the Federal Rules of Civil Procedure; the requirement of a single unified and consolidated complaint; and establishment of dates for hearing motions under Rules 12 and 23 of the Federal Rules of Civil Procedure. In addition, these orders authorized limited discovery on the Rule 12 and 23 motions and discovery on the merits of the claims against the tippees, the accountants, and the underwriters.

After the filing of the plaintiffs' First Amended Unified and Consolidated Complaint, the Court issued "Discovery Order No. 1," filed November 19, 1974, which allowed discovery to begin in the trading cases. As a result of this Order, numerous depositions were taken and thousands of documents were produced. Also, at the end of 1974, exhaustive interrogatories were served upon all plaintiffs' counsel by many of the major defendants in the litigation, including the accounting defendants and the trading defendants. The massive discovery efforts in this case had begun.

The major catalyst to full-scale discovery in this litigation, which was extensive and extended throughout the United States, was "Discovery Order No. 2," issued by the Court on October 15, 1975. There is no doubt that conducting discovery, pursuant to the provisions of Discovery Order No. 2, constituted the most time-consuming aspect of these MDL proceedings.[11] From the out-

---

10. Although the Court contemplated only a brief stay, the mere transmittal of the files from other jurisdictions took several months. Due to this and other organizational problems, the Court was forced to extend the stay for a longer period than it had hoped.

11. The Court's position as to the importance of counsel cooperation in conducting discovery had been disclosed to counsel since August, 1973. The following paragraph reflects the Court's position with respect to discovery differences between counsel:

"All discovery hereafter undertaken shall be governed by an effort to curtail delay in the administration of justice. To this end, the Court shall hereafter refuse to hear any and all motions for discovery and sanctions avail-

able under the Federal Rules of Civil Procedure unless the moving party shall have first represented to the Court in writing as part of any moving papers that, after personal, informal consultation and sincere efforts, the adverse parties are unable to reach an accord on the matter in dispute. This statement shall include, but not be limited to, the date, time and place of such informal meetings, the names of all parties and persons participating therein, and, specifying with as much particularity as possible under the circumstances, a preliminary definition of the irreconcilable issues which must be determined by an application to the court for relief, and the contentions of each party as to each issue."

Pre-Trial Order No. 2, filed August 1, 1973.

set of this litigation discovery had been vigorously pressed by the plaintiffs and vigorously opposed by defendants. This order, which was written after the Court received briefs and heard oral argument from all parties who desired to be heard, attempted to accommodate the discovery needs of all parties, and to serve the interests of justice by moving this complex litigation toward trial relatively expeditiously. Its most salient feature was its mandate that concurrent and overlapping depositions should be taken in this case.[12]

Discovery in this case included over 250 depositions and an assembly of some 1,000,-000 pages of documents. A majority of the discovery, both written and oral, involved extremely technical matters and complex issues in a field where the accounting, auditing and legal principles are unsettled.

There is no doubt that the organized and thorough discovery efforts by plaintiffs' counsel in this case allowed them to adequately respond to the numerous and varied motions in this case and intelligently discuss the possibility of settlement of all, or part, of the litigation.

Pursuant to General Management Order No. 1, a host of defendants filed voluminous motions to dismiss the First Amended Unified and Consolidated Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure, raising a plethora of novel and complex procedural and substantive issues. The complexity of the issues raised was caused by numerous facts, including the financial size of EFCA and many other defendants,[13] the alleged time span of the fraud at EFCA,[14] the size and complexity of the First Amended Unified and Consolidated Complaint,[15] the interrelationship be-

---

12. The decision to expedite discovery through the use of concurrent depositions brought an instant response from certain defendants. On November 7, 1975, Wolfson, Weiner & Co. filed a "Motion for Leave to Reconsider Discovery Order No. 2, Or In the Alternative For Certification, Etc." Numerous defendants filed memoranda joining in and supporting this motion. The motion for reconsideration or certification was denied by this Court on November 25, 1975.

On November 24, 1975, defendant Haskins & Sells filed a "Petition For Extraordinary Writ" with the Court of Appeals for the Ninth Circuit. A host of defendants joined in this petition. The petitioners coupled with their petition a "Motion for Stay" by which they sought to stay the operation of Discovery Order No. 2 pending hearing on the "Petition For Extraordinary Writ." On December 5, 1975, the Court of Appeals for the Ninth Circuit denied the petition.

Certain of the petitioners thereupon petitioned the Supreme Court of the United States for a Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit. On April 19, 1976, the Supreme Court denied the petition for certiorari.

Although this was the only time that any portion of this litigation was appealed to the Supreme Court, it portended the recalcitrant position of many defendants toward discovery in this matter. During the years of discovery, this recalcitrance caused the plaintiffs to often seek the Court's assistance in compelling discovery from the defendants. Due to the Court's desire to expedite the discovery to the fullest extent possible, hearings were often set on short notice and occasionally on-going Court trials were

interrupted for telephonic hearings with counsel during which the Court rendered decisions. Many defendants vigorously opposed much of the plaintiffs' discovery throughout this litigation and plaintiffs' counsel usually responded with swiftness of movement and accuracy of position.

13. As previously indicated, see n.5, supra, EFCA had almost 10,000 shareholders who had purchased approximately $500 million worth of securities in the corporation. The list of defendants other than EFCA was likewise impressive. It included major accounting firms, major underwriters, major banks, and even the largest single actuary firm in this country. Plaintiffs' counsel have indicated to the Court their belief that this was the first time any actuary had been sued for violations of the federal securities laws.

14. The First Amended Unified and Consolidated Complaint alleged that the fraud at EFCA was continued for eight years with the aid, complicity, and neglect of many persons and business entities outside the EFCA structure that knew or should have known about the fraud.

15. As previously indicated, this Complaint accomplished the integration of almost all of the actions relating to the EFCA debacle. One argument pressed by numerous defendants in their Rule 12 motions was that the Court was without the power to proceed under such a Complaint. See In Re Equity Funding Corporation of America Securities Litigation, 416 F.Supp. 161, 175–77 (C.D.Cal.1976).

tween the often divergent positions of the numerous representative plaintiffs,[16] and the divergent positions of numerous defendants and their insurance carriers.[17]

Remarkably, to the credit of the members of Plaintiffs' Steering Committee, plaintiffs were able to present a coordinated and unified opposition to the motions and diverse arguments of the various defendants. Such a response allowed the Court to effectively focus its attention, in a meaningful and succinct manner, on the many complex questions of law presented by the Rule 12 motions. The Court filed its Opinion on January 23, 1976. *In Re Equity Funding Corporation of America Securities Litigation*, 416 F.Supp. 161 (C.D.Cal.1976).

Proceedings to certify this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, were likewise vigorously contested by the parties. Again, the plaintiffs were able to present to the court a unified motion seeking the certification of various plaintiff and defendant classes. Additionally, plaintiffs' counsel prepared a detailed and sophisticated reply memorandum to the varied oppositions of the defendants.

The importance of class certification to the plaintiffs cannot be overstated. Some counsel have viewed it as the "*sine qua non* to the settlements" in this action.[18] In the Court's view, the importance of the class certification issues compares favorably to the importance of the transfer and consolidation issues present before the Judicial Panel on Multidistrict Litigation in 1973.

In July, 1975, class certification of the plaintiff class and subclasses was tentatively ordered by the Court substantially as prayed for by the plaintiffs. On March 26, 1976, the Court filed its detailed Memorandum Opinion and Order on the issues. That memorandum also certified the defendant classes.

Armed with the massive amount of information obtained during discovery and with definitive rulings from the Court on major substantive and procedural issues, counsel instituted serious settlement negotiations with the major defendants. From the record before this Court, these negotiations appear to have been nearly as arduous as the discovery proceedings in this case.

In January 1976, the Court, after discussions with counsel, designated the Honorable W. Matthew Byrne, Jr. as the Settlement Judge in this litigation. During the next 18 months, through lengthy and complicated settlement negotiations and with numerous discussions with Judge Byrne,[19] these counsel were able to settle substantially all of the countless claims which arose from the demise of Equity Funding Corporation of America.

The settlements, which stand as a tribute to the quality, skill, integrity, industry and team effort of counsel for all parties to this litigation, deserve mention at this point.

## II. THE SETTLEMENTS

The benefit to the class by virtue of the settlements in this action consists of sixty million dollars ($60,000,000) in cash. Counsel have represented that this is the largest

---

16. Conflicting interests on behalf of numerous plaintiffs remained a natural by-product of the size and complexity of the case.

17. Bitter disputes existed among many of the defendants and between these defendants and their insurance carriers. Disputes among the accounting defendants and their carriers were exemplary of this problem. These disputes spawned numerous actions by and between the accountants and their carriers. These actions were vigorously prosecuted in other forums, including arbitration proceedings, the Los Angeles County Superior Court, and other federal courts.

18. Affidavit of Paul M. Bernstein, filed March 2, 1977, page 10.

19. This Court agrees with the statements of all counsel who participated in these settlement negotiations that this settlement would have been impossible if it were not for the presence, patience and persistence of Judge Byrne. The unselfish act of Judge Byrne in expending countless hours and immeasurable amounts of energy in assisting in the settling of this litigation stands as a model of unflinching devotion to excellence and dedicated service to the public.

monetary settlement or judgment in a securities class action in the history of the securities laws. It befits the massiveness of the fraud in this case that the settlements would be unparalleled in the history of securities litigation.

The settlements will result in cash payments to the class members from the following defendants in the following amounts:

| A. Settling Defendants | Amounts to be Paid |
|---|---|
| Wolfson, Weiner & Co., Wolfson, Weiner, Ratoff & Lapin, Seidman & Seidman, Haskins & Sells, and certain of their present and former partners, employees and agents | $39,000,000 |
| Bache Halsey Stuart, Inc. (formerly known as Bache & Co.), and New York Securities Co., Incorporated | $3,467,500 |
| Joseph Froggatt & Co. and certain of its former partners | 3,000,000 |
| Milliman & Robertson, Inc. | 3,000,000 |
| The Estate of Michael R. Riordan and certain donees of and beneficiaries under the Will of Michael R. Riordan | 2,000,000 |
| Pennsylvania Life Company and certain of its subsidiaries, directors, officers and employees | 5,000,000 |

| | |
|---|---|
| Certain former directors, officers and employees of EFCA and its subsidiaries | 227,381 |
| Dishy, Easton & Co. | 50,000 |
| Trading Defendants | 4,000,000 [20] |
| B. The Trustee of EFCA | 250,000 [21] |

The benefits to the class achieved in this litigation are in addition to those achieved for the former holders of EFCA securities in the EFCA reorganization proceedings and in the Equity Funding Life Insurance Company (EFLIC) liquidation proceedings.

A detailed history of the settlement proceedings is unnecessary at this point. Nor is this the proper place to recount the strengths and weaknesses of the plaintiffs' claims against the various settling defendants. A few comments will suffice.

The class settlements were not negotiated in the early stages of the dispute. All the parties had been able to assess the risks of success after nearly 3½ years of litigation. Discovery by interrogatories and requests for production of documents had been completed. Counsel had also labored through roughly 250 depositions. The results obtained support the proposition that plaintiffs' counsel wisely negotiated from a position of strength.[22]

**20.** In an effort to bridge an impasse which arose in the settlement negotiations of the trading claims, counsel struck an agreement whereby $750,000 would be paid out of the $39,000,000 accountant settlement fund to the trading class defendants as compensation for the release by them of any rights of contribution against the accountant defendants, and whereby the trading class defendants would assign their rights to the $750,000, so acquired, to the trading class plaintiffs so as to satisfy their settlement demand.

**21.** To prevent the simultaneous prosecution of independent lawsuits by the class plaintiffs and the EFCA Trustee, both of whom legitimately possessed causes of action against EFCA's auditors, an agreement was reached between class counsel and the Trustee's counsel whereby $2.4 million plus certain other amounts will be paid to the Trustee out of the $39,000,000 accountants' settlement fund.

**22.** A major argument which arose in memoranda prepared in relation to counsel's applications for attorneys' fees concerned the propriety of much of the deposition discovery in this

case, especially discovery against Wolfson, Weiner & Co. and Seidman & Seidman. The position taken by some counsel was that this discovery was, at best, "perfunctory and routine," and at worst, unnecessary and "of no benefit to the class." See Objections of Plaintiff Stanley Ferber Individually and as Class Representative of Subclass Three To Certain Requests for Attorneys' Fees, pp. 19, 24–27, filed May 2, 1977.

Considering the unprecedented scope of the fraud at EFCA, the varying positions of the defendants with respect to their potential liability and insurance coverage, the fluctuating state of the applicable legal principles, and the public's interest in these proceedings, the Court is constrained to agree with counsel's decision to seek factual leverage in negotiating the settlements. Counsel who orchestrated the prosecution of this litigation struck the proper balance between an early small settlement and later substantial, informed settlement.

Consideration of the fact, as asserted by counsel, that the recovery from the accounting defendants ($39,000,000) is at least five times greater than the largest single accounting set-

The settlement package was the product of lengthy and difficult negotiations conducted over a period extending nearly two years in length, variously with and among the insurers, with and among the defendants, and with and among the various plaintiffs. The settlements consist of an extremely complex series of interrelated agreements, releases, waivers and assignments of causes of action. They were masterfully constructed and meticulously composed.

The settlements reached are indeed impressive when considered in light of the fact that, during the course of this litigation, the applicable legal principles were undergoing remarkable changes and were subject to differing interpretations. Not many of the major decisions rendered during this period served to make the liability of the major defendants in this case clearer. *See, e. g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed. 668 (1976); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Fridrich v. Bradford*, 542 F.2d 307 (6th Cir. 1976); *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975); *Clegg v. Conk*, 507 F.2d 1351 (10th Cir. 1974), *cert. denied*, 422 U.S. 1007, 95 S.Ct. 2628, 45 L.Ed. 669 (1975);

*Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731 (10th Cir. 1974).

The final act in the drama of concluding these settlements,[23] as is the case in most complex class action cases, constitutes the applications by plaintiffs' counsel for reasonable fees. Since such applications are the occasion for this opinion, and armed with the brief background facts outlined above, the Court is prepared to proceed with an examination of the specific fee applications in this litigation.

### III. THE PRESENT FEE APPLICATIONS

Pursuant to the Stipulations of Settlement, the Notice sent to members of the class, and Orders of the Court, thirty-two applications for awards of attorneys' fees have been filed with the Court. These applications seek a total award of more than $13.5 million in attorneys' fees for services rendered in this litigation.[24]

The following table accurately reflects the name of each applicant, the attorneys' fees sought by each applicant, the amount of expenses for which reimbursement is sought by each applicant,[25] and a breakdown of the amount of time expended by personnel in each applicant's firm.

tlement or judgment under the securities acts in history leads to the conclusion that counsel's efforts in developing the case in testimony under oath were of immense benefit to the class. Furthermore, the participation of this Court in deciding many complex and vigorously contested discovery issues, including claims of attorney-client and work product privilege, convinces the Court that this discovery was anything but "perfunctory and routine."

Finally, the Court notes that counsel who objects most strenuously to this discovery is the same counsel who refused to participate in any of the arduous discovery proceedings.

23. The final drama in this litigation will be a trial involving a small group of non-settling defendants which includes, among others, Stanley Goldblum, the former chairman of the board at EFCA.

24. Although one or two applicants mistakenly seek reimbursement for time spent in the EFCA reorganization proceedings, the vast majority of the applications are for services rendered only in these MDL proceedings and exclude any work performed in either the EFLIC liquidation or the EFCA reorganization pro-

ceedings. In accordance with this Court's view of the scope of its jurisdiction and authority, no award will be made to any counsel for any time spent in any other EFCA-related proceeding. Applications were accepted and passed upon by the appropriate courts which conducted those proceedings.

25. On July 29, 1977, the Court issued an order directing payment to 24 individual plaintiffs' counsel as reimbursement of out-of-pocket costs and expenses incurred by these counsel in the prosecution of this action. The applications for such payment had been filed on October 8, 1976, and on later dates. The payment of these expenses was directed to be made from a $2,000,000 Settlement Fund established in the Illinois EFLIC Liquidation Proceedings.

Since the Court had not acted on the above mentioned applications as of the date set for filing the fee applications, many counsel reapplied for their expenses; therefore, the July 29 order moots a determination as to some of the expenses requested here. Notations will be made in this opinion where appropriate to prevent duplicative awards for expenses.

SUMMARY OF ATTORNEYS' FEES

| Firm | Fee $ | Expenses | Total Hours | Partners | | Associates | | Paralegals/Clerks | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Hours | Rate/Hr. | Hours | Rate/Hr. | Hours | Rate/Hr. |
| 1. Schwartz, Alschuler & Grossman | $3,650,000.00 | $93,187.70 | 9,184.75 | 4939.75 | 100–135 | 1341 | 70–95 | 2904 | 30–40 |
| 2. Corinblit & Shapero | 3,226,305.00 | | 6,767 | 3517 | 125 | 2604 | 75 | 646 | 40 |
| 3. Wolf Popper Ross Wolf & Jones | 1,300,000.00 | 56,088.78 | 5,285 | 1475 | 100–150 | 3257 | 50–90 | 553 | 25 |
| 4. Kreindler & Kreindler | 1,236,191.00 | 32,924.43 | 4,045 | 2436 | 125–150 | 1609 | 75 | -- | -- |
| 5. David Gold | 818,683.75[26] | 18,719.36 | 1,797.75 | 1267.25 | 200 | 429.25 | 65 | 101.25 | 25 |
| a. Stanley A. Furman | 33,060.00 | -- | 275.5 | 275.5 | 60 | -- | -- | -- | -- |
| b. Milberg & Weiss | 35,990.00 | 486.24 | 137 | 137 | 75–150 | -- | -- | -- | -- |
| 6. Kohn, Savett, Marion & Graf | 750,000.00 | 40,938.88 | 3,514.75 | 249.5 | 125–250 | 2946.25 | 70–85 | 319 | 25 |
| 7. Fine, Kaplan & Black | 675,000.00 | 50,845.50 | 2,646.25 | 2355.5 | 90–135 | 290.75 | 50 | -- | -- |
| 8. Sachnoff Schrager Jones & Weaver, Ltd. | 473,752.00 | 6,136.92 | 1,401 | 1013 | 100–135 | 334.25 | 55–90 | 54 | 35 |
| 9. Kass, Goodkind, Wechsler & Gerstein | 420,000.00 | 24,516.46 | 1,586.25 | 939 | 100–125 | 647.25 | 50–85 | -- | -- |
| 10. Diamond, Tilem & Colden | 150,000.00 | 9,681.58 | 736.30 | 384.7 | 100–125 | 191.50 | 75–100 | 160.1 | 20–30 |
| 11. Irsfeld & Irsfeld | 110,000.00 | 6,989.49 | 443.5 | 41 | 88 | 262 | 63 | 140.5 | 23 |
| 12. Bader & Bader | 100,000.00 | 7,500.00 | 570 | -- | 100 | -- | -- | -- | -- |
| 13. Joseph A. Ruskay | 91,991.00 | 20,483.84 | 852 | 852 | 108 | -- | -- | -- | -- |
| 14. Nemser & Nemser | 80,000.00 | 3,238.92 | 369 | 265 | 125 | 104 | 50–75 | -- | -- |
| 15. Phillips & Mushkin | 69,675.00 | 1,207.85 | 493 | 436 | 100 | 57 | 50 | -- | -- |
| 16. State Teachers Retirement Board of Ohio | 64,232.20 | 30,211.18 | 989.25 | -- | 80–120 | -- | 60–90 | -- | 35–40 |
| 17. Shatzkin, Cooper, Labaton, Rudoff & Bandler | 56,270.00 | 7,517.11 | 275.75 | 250 | 125 | 25.75 | 80 | -- | -- |
| 18. Katz, Hoyt & Bell | 50,000.00 | 1,155.28 | 266.46 | -- | 100 | -- | 55–75 | -- | -- |
| 19. Samuel Sebba | 37,000.00 | 9,706.85 | 260 | 260 | 142 | -- | -- | -- | -- |
| 20. McDermott, Will & Emery | 33,900.00 | 12,475.25 | 339 | -- | 100 | -- | 65 | -- | -- |
| 21. Kirsch, Arak & Bulmash | 27,000.00 | 2,670.85 | 179 | -- | -- | -- | -- | -- | -- |
| 22. Frieman, Rosenfeld & Zimmerman | 23,000.00[27] | 1,431.71 | 128.8 | 128.8 | 75 | -- | -- | -- | -- |
| 23. Steinhaus & Hochhauser | 15,600.00 | -- | 65 | 65 | 80 | -- | -- | -- | -- |
| 24. Pryor, Cashman, Sherman & Flynn | 13,973.75 | 5,533.83 | 135.50 | 125.50 | 75–125 | 10 | 85–90 | -- | -- |
| 25. James P. Chapman | 13,500.00 | 1,202.81 | 100 | 100 | 90 | -- | -- | -- | -- |
| 26. Much, Shelist, Freed, Denenberg & Ament, P. C. | 8,650.00 | 79.80 | 36.6 | 36.6 | 85 | -- | -- | -- | -- |
| 27. Phillips, Nizer, Benjamin, Krim & Ballon | 8,606.00 | 3,750.21 | 133.25 | 43.50 | 50–200 | 89.75 | 40–65 | -- | -- |
| 28. DiFalco, Field & Lomenzo | 6,285.00 | 15.00 | 84 | 84 | ? | -- | -- | -- | -- |
| 29. Demov, Morris, Levin & Shein | 4,272.50 | 98.10 | 64.50 | 25.25 | ? | 39.25 | ? | -- | -- |

26. This figure represents the total amount of attorneys' fees sought by Mr. Gold to reimburse his law firm for a total of 1,797.75 hours expended in the prosecution of this action. This figure does not include the additional sums requested in Mr. Gold's application as reimbursement for time spent by Mr. Gold's local counsel, Mr. Furman, and a firm with which Mr. Gold associated, Milberg & Weiss. These requests are listed as 5(a) and 5(b) below and they will be considered along with Mr. Gold's application, at a later point in this opinion.

27. This figure includes a request for $4,000 in attorneys' fees for services rendered in the EFCA reorganization proceedings.

SUMMARY OF ATTORNEYS' FEES—Continued

| Firm | Fee $ | Expenses | Total Hours | Partners Hours | Partners Rate/Hr. | Associates Hours | Associates Rate/Hr. | Paralegals/Clerks Hours | Paralegals/Clerks Rate/Hr. |
|---|---|---|---|---|---|---|---|---|---|
| 30. Chapman and Cutler | 3,108.50 | 7,402.93 | 40.50 | 40.50 | 75–80 | – | – | – | – |
| 31. Bachner, Tally & Mantell | 3,000.00 | 5,566.30 | 139.25 | 139.25 | 100 | – | – | – | – |
| 32. Alvin B. Green | ? | 140.47 | 110.00 | 110.00 | 75 | – | – | – | – |
| | $13,589,045.70 | $461,903.13[28] | 43,450.91 | | | | | | |

| | | Total | Partners | Associates | Paralegals/Clerks |
|---|---|---|---|---|---|
| | | Total | Partners | Associates | Paralegals/Clerks |

The applications filed with the Court are thorough and exhaustive. The contents of the applications were dictated by an order of the Court, filed February 2, 1977, which reads substantially as follows:

"In addition to any affidavits and exhibits counsel may wish to include in their fee applications, the Court, by this Order, requires each counsel who applies for fees in this litigation to include in his or her fee application the following information:

(1) Complete copies of all time records kept by counsel in M.D.L. Docket No. 142 for which fees are sought.

(2) Complete copies of any written fee contract, if any, relating to this litigation and entered into with counsel's respective clients or a recitation in full of any oral agreement re fees in this litigation entered into with their respective clients.

(3) Complete copies of any written fee arrangement, or a recitation in full of any oral agreement, by and between any counsel or group of counsel in this litigation.

(4) A recitation and brief explanation of any and all fees obtained by any counsel in any EFCA-related litigation or proceeding, including, but not limited to, the EFLIC proceedings in Illinois, proceedings before the M.D.L. panel, and the EFCA reorganization proceedings. Additionally, a recitation of any duplicated or overlapping fee requests and, if such exist, a statement in justification of such duplicative requests. Finally, complete copies of all time records kept by counsel for work done in any EFCA-related litigation or proceeding.

(5) Complete copies of all fee applications and time records in all other contingency cases handled by counsel during the pendency of this litigation in which court approval of attorneys' fees was required and in which such approval has either (a) been obtained or (b) is pending, excepting any time records relating to *In Re Consolidated Mattel Securities Cases.*[29]

In contingency matters handled by counsel during the pendency of this litigation in which fee applications have not been filed, but are anticipated to be filed pursuant to counsel's obligation to obtain court approval of attorneys' fees, counsel must state (a) the name of the case, (b) the nature of the case, (c) an estimate of

28. In addition to counsel listed who applied for attorneys' fees and expenses, the following five firms applied for only reimbursement of expenses in the following amounts: (1) Jones, Day, Reavis & Pogue—$15,000; (2) Hirschler, Fleischer, Weinberg, Cox & Allen—$15,000; (3) Dorsey, Windhorst, Hannaford, Whitney & Halladay—$5,000; (4) Franklin, Ullman, Kimler & Entin, P.A.—$1,618; (5) Cole & Deitz—$750.

A review of the court's order, issued July 29, 1977, discloses that the above applications are moot, except (a) $10,000 requested by Jones, Day, Reavis & Pogue and (b) the $15,000 request by Hirschler, Fleischer. These applications will be addressed at a later point in this Opinion.

29. Time records for this case, which was proceeding in this Court, had already been filed with the Court by counsel in connection with his fee petition in *In re Consolidated Mattel Securities Cases.*

the amount of hours expended to date, and (d) the dates between which such services were rendered.

Production of the information and records listed above, along with affidavits of counsel, will meet the minimum standards, as established by this Court, for complete and accurate fee applications. For a discussion of the general standards that will be employed by the Court in reviewing the fee applications, counsel's attention is directed to the cases of *Grunin v. International House of Pancakes*, 513 F.2d 114 (8th Cir. 1975); *City of Detroit v. Grinnell Corporation*, 495 F.2d 448 (2d Cir. 1974); *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corporation*, 487 F.2d 161 (3d Cir. 1973); *Liebman v. Petersen Coal & Oil Co.*, 63 F.R.D. 684 (N.D.Ill.1974). The Court also commends to counsel's attention the *Manual for Complex Litigation*, pt. I, § 1.47 (rev. ed. 1973) and the Code of Professional Responsibility of the American Bar Association § DR 2–106."

Pursuant to this order, the Court received more substantiating evidence of the effort expended by counsel than that submitted in any other securities class action of which the Court is aware. Each application consists of volumes of detailed information regarding the nature of the services performed by counsel and the members of their law firms. Each application has been carefully reviewed by the Court.

Additionally, this Court has first-hand knowledge of the numerous factors which comprise the fee applications, having lived with this litigation and every facet of it over the past four years. In this position, the Court has presided over proceedings which consume some 131 pages of docket entries and which have resulted in the issuance of in excess of 183 written orders

and memorandum opinions. It is from this unique perspective that each application for attorneys' fees will be viewed.

Pursuant to paragraph 55 of the Important Notice of Proposed Settlements and Class Action Determination to Present and Former Owners of Equity Funding Corporation of America, certain counsel of record and some parties filed written objections to the fee applications of certain counsel in this litigation. Objections were filed by (a) counsel for the State Teachers Retirement Board of Ohio, (b) counsel for class members Linda Levy and Richard Kamen, (c) the firm of Fine, Kaplan and Black, (d) Marshall B. Grossman and Jack Corinblit, Plaintiffs' Liaison Counsel and Plaintiffs' Co-Chairman, respectively, (e) counsel for Lawton General Corporation, (f) counsel for Fidelity Corporation, (g) counsel for Princeton University and other defendants, (h) counsel for Robert Selig, representative plaintiff for Class I, 9½% debenture holders, (i) Morgan Guaranty Trust Company of New York and The Ford Foundation,[30] and (j) counsel for plaintiff Stanley Ferber, the class representative of Subclass Three. These objections were carefully read and considered by the Court and they proved valuable in illuminating the plethora of issues raised by the thirty-two fee applications. The issues raised by the objections will be discussed in this Opinion's analysis of the reasonable fees for counsel in this litigation.

The objections also resulted in the extension of the time for the fee hearing from the originally-allotted three hours to two full days. During the two-day evidentiary hearing various counsel testified under oath and were cross-examined, numerous counsel argued in support of their fee applications, and every counsel and class member who desired to speak was given the opportunity.

---

**30.** These class members, Ford and Morgan Guaranty, filed claims in these proceedings respecting 737,000 shares of common stock of EFCA and $6,250,000 aggregate principal amount of EFCA 5¼% subordinated convertible debentures. Despite the fact that they are two of the largest claimants in this litigation, their counsel made the deliberate decision, in 1973, not to prosecute any law suit against EFCA or others. Necessary components of such a decision must have been an evaluation of the risk and expense involved. In light of counsel's ability, demonstrated in their thorough objection to the fees of other counsel, it is unfortunate that these parties chose not to prosecute any portion of this litigation. Their participation would have been welcomed by the Court and fellow counsel.

In making the awards that follow, the Court has carefully considered all the pleadings mentioned above, including the thirty-two applications, their exhibits, and all objections they prompted. Due consideration has also been given to the comments and testimony of counsel contained in the 381 page Reporter's Transcript of the evidentiary hearing held by the Court.

## IV. THE PROPER STANDARD

■ Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members. *See, e. g., Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir. 1975); *Norman v. McKee,* 431 F.2d 769, 774 (9th Cir. 1970). In fulfilling that duty, a proper fee award can only be made on the basis of sufficient specific evidence regarding the time spent on the litigation, *Grunin, supra,* at 126, and after the district court elucidates the factors upon which the award is based and relates those factors to the facts and figures submitted by plaintiffs' counsel. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974).

■ While counsel are entitled to adequate attorneys' fees to "compensate the attorney for the reasonable value of services benefiting the [class]," *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corporation,* 487 F.2d 161, 167 (3d Cir. 1973), the district court must act with jealous regard to the rights of those who are interested in the fund and must not only avoid awarding "windfall fees" but avoid every appearance of having done so. *See City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 469 (2d Cir. 1974) ("Grinnell I").

■ The purposes behind an award of reasonable attorneys' fees have been accurately stated as follows:

"The guiding principles in determining awards of attorneys' fees should be to provide compensation sufficient to stimulate the motive for representation of classes and to ensure that the fees awarded are consistent with the degree of benefits bestowed upon the class insofar as the bestowing of those benefits can be shown to be the product of the lawyers' work." *Manual for Complex Litigation* (Tent. Draft of the 4th Revision, July 21, 1976).

On the other hand the evils attendant to awards of excessive or "windfall" fees are obvious. First, such awards naturally decrease the amount of recovery to the members of the class. Second, the award of excessive fees to counsel for a class may provoke severe public criticism and stimulate efforts to repeal or restrict the salutory aspects of Rule 23.[31]

Fortunately, in determining the amount of attorneys' fees that is reasonable, this Court is not without some judicial guidelines. Although the guidelines for determining reasonable fees in class actions of this type are still in the process of evolution and clarification, a number of recent decisions have delineated certain factors to be considered in arriving at allowances to counsel. *See, e. g., City of Detroit v. Grinnell Corporation,* Nos. 76–7252, 76–7253, 76–7254, 560 F.2d 1093 (2d Cir., filed August 30, 1977) ("Grinnell II"); *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corporation,* 540 F.2d 102 (3d Cir. 1976) ("Lindy II"); *Grunin v. International House of Pancakes,* 513 F.2d 114 (8th Cir. 1975); *Merola v. Atlantic Richfield Co.,* 493 F.2d 292 (3d Cir. 1974) ("Merola I"); 515 F.2d 165 (3d Cir. 1975) ("Merola II"); *City of Detroit v. Grinnell Corporation,* 495 F.2d

---

**31.** This concern was concisely stated by the Court in *City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 469 (2d Cir. 1974) ("Grinnell I") quoting *Illinois v. Harper & Row Publishers,* 55 F.R.D. 221, 224 (N.D.Ill.1972) as follows:

"If Rule 23 is to be preserved against *deserved* criticism some attempt must be made by the court to suit the award of the fees to the performance of the individual counsel in light of the size of the settlement. Otherwise, the attorneys who are taking advantage of class actions to obtain lucrative fees will find themselves vulnerable to the criticism expressed in the Italian proverb, 'A lawsuit is a fruit tree planted in a lawyer's garden.'"

*See also Grinnell II,* 560 F.2d at 1098–1099 (2d Cir. 1977).

448 (2d Cir. 1974) ("Grinnell I"); *Brandenburger v. Thompson,* 494 F.2d 885 (9th Cir. 1974); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974); *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corporation,* 487 F.2d 161 (3d Cir. 1973) ("Lindy I"); *Liebman v. Petersen Coal & Oil Co.,* 63 F.R.D. 684 (N.D.Ill.1974).[32] These cases stand not only as an aid to the court, but as notice to counsel of the standards to be met by any fee application. All these decisions lead to the inevitable determination that the fee should be "reasonable."

■ Until recently, many courts awarding fees in class actions fixed the fees as a percentage of the recovery or settlement fund. *See, e. g., Brown Co. Securities Litigation,* 355 F.Supp. 574, 592–93 (S.D.N.Y. 1975) (25% of settlement fund); *Feder v. Harrington,* 58 F.R.D. 171, 177 (S.D.N.Y.

1972) (24% of settlement fund). This Court expressly rejects such an approach as being arbitrary and inconsistent with both the purpose of awarding attorneys' fees and the concerns about awarding excessive attorneys' fees.

■ Although some courts have analyzed numerous factors in passing upon the reasonableness of an application for attorneys' fees,[33] it appears to this Court upon careful reading of the opinions that the factors employed are merely components of the four factors stated in the seminal case of *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corporation,* 487 F.2d 161 (3d Cir. 1973) ("Lindy I"). The four relevant factors stated in *Lindy I* are (a) the hours spent by the attorneys, (b) the hourly rate of compensation, (c) the risk borne by the attorneys, and (d) the quality

**32.** Additionally, the Court has found the wisdom of the following commentators instructive in developing the criteria employed in this Opinion. Pomerantz, "Class Action Controversy: Legal Fees," in *Current Problems in Federal Civil Practice* 367 (B. Garfinkle ed. 1975); W. Knepper, *Liability of Corporate Officers and Directors,* 13.13, "Class Actions: Attorneys' Fees and Expenses" (2d ed. 1969, 1973); Comment, "Attorneys—New Standard, Reflecting the Nature of the Action, Applied to Determine a Reasonable Fee Award for Class Action Attorneys," 8 *Suffolk U.L.Rev.* 1354 (1974); Comment, "Balancing the Equities in Attorneys' Fees Awards; Losing Plaintiffs and Private Defendants," 62 *Geo.L.J.* 1439 (1974); Comment, "Computing Attorney's Fees in Class Actions: Recent Judicial Guidelines," 16 *Bost.Coll.Ind. & Com.L.Rev.* 630 (1975); Comment, "Reimbursement for Attorneys' Fees from the Beneficiaries of Representative Litigation," 58 *Minn. L.Rev.* 933 (1974).

**33.** The court, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 245 F.Supp. 258 (M.D. Pa.1965), vacated on other grounds, 377 F.2d 776 (3d Cir. 1967), *aff'd in part and rev'd in part,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), stated the following nine factors:
(1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the government;
(2) the standing of counsel at the bar—both counsel receiving the award and opposing counsel;
(3) time and labor spent;
(4) magnitude and complexity of the litigation;
(5) responsibility undertaken;

(6) the amount recovered;
(7) the knowledge the court has of conferences, arguments that were presented, and of work shown by the record to have been done by attorneys for the plaintiff prior to trial;
(8) what it would be reasonable for counsel to charge a victorious plaintiff; and
(9) the attorneys' "risk of litigation."
On the other hand, the court in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), employed the following 12 factors:
(1) the time and labor required,
(2) the novelty and difficulty of the questions,
(3) the skill requisite to perform the legal service properly,
(4) the preclusion of other employment by the attorney due to acceptance of the case,
(5) the customary fee,
(6) whether the fee is fixed or contingent,
(7) time limitations imposed by the client or the circumstances,
(8) the amount involved and the results obtained,
(9) the experience, reputation, and ability of the attorneys,
(10) the "undesirability" of the case,
(11) the nature and length of the professional relationship with the client,
(12) awards in similar cases.
*See also Arenson v. Board of Trade of City of Chicago,* 372 F.Supp. 1349 (N.D.Ill.1974), listing some 15 factors.

of the attorneys' work. These four factors have been considered by this Court in making the fee awards that follow; however, as indicated above, the Court believes these four factors subsume consideration of many other factors which have been stated by numerous courts. Thus, (d) above is evidenced by the work observed by the court, the novelty and complexity of the issues, the monetary amount involved and the results obtained, and the standing of counsel at the bar. Factor (c) above is a factor of the contingent nature of the case, reflecting the likelihood that hours were invested and expenses incurred without assurance of compensation. Additionally, reflected in (c) is the availability of a prior judgment or decree in a related case brought by the government. Factor (b) above encompasses consideration of the preclusion of other employment by the attorney due to acceptance of the case and the customary fee for similar work in the community. Factor (a) requires a judge, in addition to reviewing time records submitted by counsel, to weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities. Also, under (a), the possibility of duplication of effort among counsel should be scrutinized.

■ Not only did *Lindy I* identify the relevant factors to be considered, but it also presented a reasoned process for calculating the fee award: First calculate the number of hours worked, then multiply by the hourly rate to determine a base fee. This base fee was described by the Court in *Lindy I* as the "lodestar" of the Court's fee determination. Only after the base fee or "lodestar", is fixed, can the Court consider such intangibles as risk and quality. *Lindy I, supra,* 487 F.2d at 167–69. This process is used by this Court in making the awards that follow.

■ Finally, three additional factors, originally suggested in the *Manual for Complex Litigation,* should be remembered in assessing any fee application and have been considered by this Court:

" . . . (1) that in seeking and accepting employment as counsel for a judicially determined class an element of public service is involved; (2) the representation of the class by counsel is not a result of private enterprise but results from provision of an opportunity to represent the class by a judicial determination; and (3) the policy of the law in class actions, including antitrust actions, is to provide a motive to private counsel to represent consumers and to enforce the laws."

## V. THE REASONABLE FEES FOR COUNSEL IN THIS LITIGATION

As indicated in the preceding section of this Opinion, this Court rejects the percentage or lump sum approach to awarding fees in litigation of this type. Instead, the Court will apply the four factors stated in *Lindy I* and consider the components of these factors, as stated above. Prior to analyzing the specific applications of each counsel, it is appropriate to discuss and decide some general issues which permeate the entire application process, and thereby, each application. The resolution of these issues will be helpful in analyzing the specific applications of counsel.

### A. *Time Spent*

■ The cases discussed above establish the basic principle that "multiplying attorney's hours and typical, hourly fees . . . is the only legitimate starting point for analysis." *City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 471 (2d Cir. 1974). Cases such as *Lindy I* and *Grinnell I* establish the obligation on applicant-counsel to adequately demonstrate and substantiate the time spent and the services rendered on behalf of the class. The burden is clearly on counsel to file adequately-documented applications for fees and those who fail to meet that burden do so at their own risk.

■ These cases further indicate that the Court, in passing upon the reasonableness of the fees requested, must weigh the hours claimed against its own knowledge, experience, and expertise of the time required to complete similar activities. Addi-

**1328**

tionally, duplication of effort, if any, should be determined and discounted.

■■■■ Certain of the objectors in this case cautioned that courts must be careful when leaving the percentage formula for awarding fees and adopting the *Lindy* and *Grinnell* approach that "hours do not become the name of the game." The Court agrees that counsel in this type of case should not be compensated for every hour spent if it appears that wasteful and duplicative efforts were expended in an attempt to unnecessarily enlarge the ultimate fee request. Two controls, however, will be applied to prevent this phenomenon: First, as a matter of human nature, counsel will not expend exorbitant amounts of time, for which there is no guarantee of reimbursement, in litigation of a substantially risky nature. Second, as a more important check in preventing such unwarranted behavior, every Court has the obligation to carefully scrutinize the hours spent and the tasks performed and, as indicated above, weigh the hours claimed against its own knowledge, experience, and expertise of the time required to complete similar activities. Although it is counsel and not the Court who must be charged with the obligation of making tactical decisions regarding the prosecution of litigation, a Court must not hesitate to reduce the lodestar computed when the result obtained is the product of an unnecessarily extended proceeding. *See Lindy II, supra,* 540 F.2d at 118.

■■■■ In the vast majority of the present applications before the Court, counsel, pursuant to the February 2 Order of the Court, have filed complete and accurate time records in support of their requested fees. Additionally, most applicants have provided the Court with a breakdown of the hours spent into various recognized categories, namely partner, associate, and paralegal. Thus, the applications have been subject to effective scrutiny by the members of the class and the Court. In those applications as indicated below, in which counsel have failed to adequately support the fee re-

quested with contemporaneously maintained time records, the Court must, and will, make reductions in the fee requested. *See Grunin v. International House of Pancakes,* 513 F.2d 114, 127–128 (8th Cir. 1974).

■■■■ The magnitude of this litigation makes it a possible paradigm case for duplicative and overlapping efforts by counsel. As previously indicated in this Opinion,[34] such efforts in the initial stages of these proceedings were an unavoidable by-product of the magnitude of the case and the lack of consolidation. The Court, and the class, must accept this; however, once consolidation and coordination occurred, there existed little justification for duplicative and overlapping efforts. In analyzing the present applications, the Court will make reductions in the fee requested when such efforts are discerned. *See Liebman v. J. W. Petersen Coal and Oil Co.,* 63 F.R.D. 684, 690 (N.D.Ill.1974).

■■■■ Finally, reductions in certain requests for fees must be made because the effort expended by counsel falls into a third identifiable category. This category consists of work performed which may have been of substantial benefit to the individual client, but was of no, or insubstantial, benefit to members of the class. Pursuant to the case authority discussed previously, the Court is of the opinion that the class members may only be required to pay for those services which were of some benefit to them. Thus, where the Court discerns that counsel's efforts were expended for the exclusive, or primary, benefit of an individual, private client, reductions in the fee requested must be made.

■■■■ Certain objectors, most notably counsel for plaintiff Stanley Ferber, have urged the Court to make substantial reductions in the fees requested by Plaintiffs' Liaison Counsel, Mr. Marshall Grossman, and Co-Chairman of Plaintiffs' Steering Committee, Mr. Jack Corinblit, because

"[a] substantial portion of Messrs. Grossman and Corinblit's efforts were limited to reviewing and editing pleadings draft-

---

**34.** *See* n. 6, and accompanying text, *supra.*

ed by others, coordinating and consulting on discovery matters being handled by others, and applying ideas and concepts originated by others." Objections of Plaintiff Stanley Ferber, p. 22.

Even assuming this to be true, since the Court was primarily responsible for assigning such tasks to these counsel,[35] it is now constrained to award them reasonable compensation for the services rendered. There is no doubt that the efforts in coordinating and directing the activities of co-counsel were essential to the effective prosecution of the litigation and beneficial to the members of the class.

■ On the other hand, many counsel who were not on the Plaintiffs' Steering Committee and who were not active in the prosecution of this litigation seek compensation for substantial number of hours expended in "reviewing" pleadings, transcripts, and records from these proceedings. The need for every plaintiffs' attorney to "review" every single document that passed his desk was obviated by the furnishing of regular status reports, from the Steering Committee, to all plaintiffs' counsel informing them of the progress of the litigation and all related legal proceedings. The "review" work of plaintiffs' counsel should legitimately be limited and compensated for when it had a direct bearing upon the responsibility being undertaken by such counsel during the course of these proceedings. Clearly, since the Plaintiffs' Steering Committee was charged with, and fulfilled, the responsibility of prosecuting this action on behalf of the class members, any "review"

work which does not bear a reasonable relationship to responsibility undertaken on behalf of the Committee is subject to close scrutiny. Such efforts may have been duplicative and for the sole benefit of counsel's individual client. If so, as previously indicated, reductions in the fees requested must be made.

With these general observations in mind, the Court will carefully scrutinize the time expended by counsel in this litigation.

### B. *The Hourly Rate of Compensation*

■ In analyzing each application below, once careful scrutiny of the time spent has occurred, the Court will compute the value of the services by multiplying the number of hours by the hourly amount to which attorneys of like skill in the area should be entitled for the given type of work on the basis of an hourly rate of compensation. *City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 471 (2d Cir. 1974). In computing the hourly rates to be applied to these applications, the Court is additionally mindful of the fact that acceptance of this case may have resulted in the preclusion of other employment by many of these counsel.

■ As the Summary of Attorneys' Fees on pages 15 and 16 of this Opinion indicates, various hourly rates have been requested by the petitioners. Partners involved in the case seek hourly fees ranging from $60 to $250 per hour, while the requested hourly rate for associates ranges from $40 to $100. Such variations are un-

---

**35.** In General Management Order No. 1, filed in July, 1974, the Court envisioned that these counsel would necessarily spend substantial amounts of time in organizational and directional activities. The order read, in part, as follows:

"The Steering Committee shall provide general supervision and direction to the activities of plaintiffs' counsel. It is expected to maintain communication and promote a spirit of harmony with all plaintiffs' counsel. The Steering Committee shall execute the orders of the Court as to the conduct of the litigation, receive, formulate, and draft material for the plaintiffs including such material as interrogatories, pleadings, motion papers,

and the like; and initiate proceedings in Court, proceedings outside of Court, and discovery efforts of the plaintiffs." General Management Order No. 1, July 24, 1974, pp. 2–3.

The evidence presented to the court demonstrates, and the Court's experience with this litigation confirms, the fact that these two counsel not only led the Plaintiffs' Steering Committee, but spearheaded and organized every major aspect of this lawsuit. It is evident that on many occasions the tasks they performed were as necessary to the effective prosecution of this case as they were distasteful to those counsel who now object to the requested compensation.

derstandable in a case such as this which involves counsel from firms of varying size and experience and from various geographical locations in the country. In fact, the Court would be remiss in its duty of examining each individual application if it applied a single rate for all partners and another for all associates.

The objectors to the fee applications raise numerous issues with respect to the hourly rates of compensation in this case. These issues must be addressed at this point in the Opinion.

Certain of the objectors to the fee petitions argue that each petitioner must break down the hours spent by the type of task performed because this Court should apply differing hourly rates according to the type of task. They contend that less important tasks, for example, administrative work— should be compensated for at a lower rate than more important tasks.

The Court agrees that the various types of tasks performed must be scrutinized by the Court; however, it is impossible for the Court to award various hourly rates for numerous counsel who performed hundreds of tasks during the last four years. Furthermore, the Court is unable to judge whether time spent on oral argument is more, or less, important than time spent in preparing, through research and drafting, for the argument. Finally, the Court believes that prominent defense counsel charge the same hourly fee for the various tasks which are necessary to litigate any case.

■■■■■ The Court does, however, have a duty to analyze the tasks performed, to assure the class that the various tasks are being performed by individuals with the appropriate skills. For example, paralegal tasks should not be undertaken by senior partners who seek compensation for their time at premium rates. Additionally, the Court agrees with the objectors insofar as they assert that post-settlement claims administration and time spent preparing for application should not be compensated for at the same rate as other time expended in the litigation. In the Court's view, because such activities occur after the litigation has been settled, it is unreasonable to multiply the hourly rate requested by any contingency factor. The Court is, however, unable to conclude that such tasks are worth less than the normal hourly rate charged by counsel.[36]

The objectors also argue that paralegal time should be compensated for as out-of-pocket costs or wages, and that counsel who utilize such trained personnel in an effort to minimize attorneys' time, should not recover the normal hourly rates at which such paralegal time is billed or any multiplier of those hourly rates. The case law appears to be a state of flux on this issue. *Compare City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974) ("Grinnell I") *with In re Gypsum Cases,* 386 F.Supp. 959 (N.D.Cal. 1974) and *Oppenlander v. Standard Oil Company,* 64 F.R.D. 597 (D.C.Colo.1974).

■■■ Although this Court agrees with the Court in *Oppenlander* that "[t]he use of paralegals is to be encouraged in complex litigation," *Oppenlander v. Standard Oil Company, supra,* at 613, and believes that such time should be compensated for at the normal hourly rate billed, the Court finds it unreasonable to multiply the hourly rate requested by any contingency factor. Although they provide a valuable service, for which compensation should be given, paralegals are not members of the bar and do not share in the attorneys' risk of litigation.

The final major argument raised by the objectors relating to the hourly rate of compensation raises the issue of whether the Court should apply "historical hourly rates"

---

**36.** Additionally, according to recent precedent, compensation for the efforts spent by counsel in preparing their fee applications cannot be allowed. *See City of Detroit v. Grinnell Corporation,* Nos. 76–7252, 76–7253, 76–7254, 560 F.2d at 1102 (2d Cir. 1977) ("Grinnell II"), and cases cited therein. Such efforts are expended primarily for the benefit of counsel and not for the benefit of the class or the settlement fund; therefore, the Court must make reductions in the lodestars requested by subtracting time spent by counsel in preparing their fee applications.

to the tasks performed by partners and associates, or whether the Court should calculate the value of the services rendered on the basis of counsel's present hourly rate. There are persuasive considerations on both sides of the issue.

 The objectors argue that, at least, every applicant should be required to disclose his historic rates to satisfy the Court that on the eve of submitting a fee application, counsel's rate hasn't been increased.[37] The Court agrees with this position.

The objectors then argue that the only reasonable method of valuing the services rendered is for the Court to apply the historical hourly rates in effect at the time the tasks were performed to the hours expended in performing those tasks. They further posit that any contingency factor used to increase the lodestar necessarily includes consideration of the delay in receipt of payment for services rendered.

Plaintiffs' Liaison Counsel, and other applicants, agree that historical rates should be disclosed to the Court; however, the applicants vociferously object to the use of those historical rates in awarding compensation for tasks performed over the four-year period. Their major argument is that such a procedure ignores the fact that the attorneys have been without the use of money during the lengthy pendency of this action. Thus, they argue that the application of the *current hourly rates* in determining the "lodestar" rate merely reasonably compensates the attorney for having waited as long as four years for payment for services rendered.

 Although no case appears to have specifically addressed and resolved this issue, the Court finds that the better view is to apply the hourly rates in effect at the time the services were rendered. It is clear from cases such as *Lindy* that at least a portion of any contingency multiplier includes consideration of the fact that counsel have suffered a delay in the payment for services rendered. Recently, the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976), reaffirmed this principle as follows:

> "The court may increase the amount established in the computation of the 'lodestar' as a reasonable fee on the basis of a careful evaluation of the following factors:
>
> . . . . .
>
> 3. The delay in receipt of payment for services rendered." 540 F.2d at 117.

This substantially undercuts the argument pressed by the applicants. The Court will, therefore, use historic hourly rates in establishing the appropriate "lodestar" for counsel in this case.[38]

## C. *The Contingency Factor*

Consideration of a contingency factor is central to the fee determination in class actions of this type because virtually all of them are contingent in nature. The Court in *Grinnell I* emphasized the importance of this factor as follows:

> "Perhaps the foremost of these factors is the attorney's 'risk of litigation,' *i. e.,* the fact that, despite the most vigorous and competent of efforts, success is never guaranteed. The greater the probability

---

**37.** *The objectors admitted to discerning no applications in which this occurred. The Court is likewise unable to find any eleventh-hour rate increases.*

**38.** Fortunately, counsel who seek a major portion of the attorneys' fees in this litigation have provided the Court with information regarding their historical hourly rates and the services performed during the relevant years of this litigation. In passing upon any applications in which such information is not provided, the Court will reduce the current hourly rate requested, and attempt to arrive at an approxi-

mate weighted average. This will involve a close comparison of other fee applications filed by the applicant during the last four years and the historical hourly rates charged by other counsel. Such a procedure is justified under prior case law which indicates that an important consideration in determining the appropriate value of the services is "the hourly amount to which attorneys of like skill in the area would typically be entitled . . . " *City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 471 (2d Cir. 1974).

of success, of either ultimate victory on the merits or of settlement, the less this consideration should serve to amplify the basic hourly fee. The tangible factors which comprise the 'risk of litigation' might be determined by asking the following questions: has a relevant government action been instituted or, perhaps, even successfully concluded against the defendants; have related civil actions already been instituted by others; and, are the issues novel and complex or straightforward and well worn? Thus determined, the litigation risk factor might well be translated into mathematical terms." *City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 471 (2d Cir. 1974).

As previously indicated in this Opinion, numerous factors may be considered in determining the attorney's risk of litigation. The attorney's risk of litigation is a factor of the contingent nature of the case, reflecting the likelihood that hours were invested and expenses incurred without assurance of compensation. The risk of litigation is also affected by the availability of a prior judgment or decree in a related case brought by the government or a governmental agency.

Perhaps the most concrete expression of the criteria for evaluating the contingency factor is. stated in the *Lindy II* decision. The Court in *Lindy II* stated:

"Under the rubric of 'the contingent nature of success' the district court should appraise the professional burden undertaken—that is, the probability or likelihood of success, viewed at the time of filing suit. The court may increase the amount established in the computation of the 'lodestar' as a reasonable fee on the basis of a careful evaluation of the following factors:

1. Analysis of plaintiff's burden. Subsumed in this category are the following considerations: (a) the complexity of the case—legally and factually; (b) the probability of defendant's liability,—whether it is clear or dubious; whether it has been previously suggested by other civil or criminal proceedings; whether it is asserted under existing case law or statutory interpretation, or is advanced as a novel theory; (c) an evaluation of damages,—whether the claims would be difficult or easy to prove.

2. Risks assumed in developing the case. This category subsumes consideration of: (a) the number of hours of labor risked without guarantee of remuneration; (b) the amount of out-of-pocket expenses advanced for processing motions, taking depositions, etc.; (c) the development of prior expertise in the particular type of litigation; recognizing that counsel sometimes develop, without compensation, special legal skills which may assist the court in efficient conduct of the litigation, or which may aid the court in articulating legal precepts and implementing sound public policy.

3. The delay in receipt of payment for services rendered.

If, having considered the foregoing or other relevant criteria, the district court desires to increase the 'lodestar' award, it should identify those factors supporting its conclusion, state the specific amount by which the basic fee should be increased due to the contingency of success, and give a brief statement of reasons therefor. We reiterate that any such increment in the 'lodestar' award is to be considered and applied apart from the evaluation of the quality of services rendered in the particular proceedings." *Lindy II,* 540 F.2d at p. 117.

The contingent nature of this litigation has been the subject of substantial dispute between the applicants and the objectors, and even among various of the applicants. Two major issues appear to have emerged in the pleadings and oral arguments of counsel. First, considering the nature of the risk involved in this case, what are appropriate contingency mulipliers to be applied to the lodestar fees of counsel? Second, whether a "sliding scale" contingency factor, which takes into account both the different risks inherent in different tasks and the possibility that the risk diminished as the litigation proceeded, should be applied to the lodestar fees of counsel?

As to the first issue, Plaintiffs' Liaison Counsel, Marshall Grossman, and Co-Chairman of Plaintiffs' Steering Committee, Jack Corinblit, contend that the litigation has involved "substantial risk" from inception through the date of receipt of the defendants' signatures on the settlement documents. Their assessment of the risk involved in this case is evidenced in their request that a multiple of five (5) be applied to the lodestar fee computed in their application. They submit that their assessment is supported by numerous facts contained in the record, including (a) the deliberate decision of counsel for numerous institutional plaintiffs with immense losses in EFCA securities, including Morgan Guaranty Trust Company and the Ford Foundation, two major objectors in these proceedings, not to actively prosecute their claims; (b) the deliberate decision by these same institutional plaintiffs not to "opt out" of the settlement, gather the massive discovery produced, and litigate their claims; (c) the issuance of decision after decision of the Ninth Circuit and the United States Supreme Court eroding the rights of plaintiffs and classes under the securities laws;[39] (d) the divergent positions of numerous defendants and their insurance companies;[40] and (e) the plethora of novel and complex issues raised by the magnitude of every aspect of this litigation.

The position of the major objectors is that "the risk of nonrecovery in the present case was negligible." They admit that there was some risk involved, but contend that the risk was minimal; therefore, they assert that only a minimal, if any, risk multiple should be applied to the lodestar fees requested by counsel. In support of their position, they point to several facts contained in the record of this case, including (a) the fact that the existence of a massive fraud at EFCA and the complicity of a major EFCA insurance subsidiary, EFLIC, have been matters of widespread public comment and analysis since April of 1973; (b) the fact that numerous EFCA defendants, including three individuals who were principally responsible for the EFCA audits, were convicted in related criminal securities fraud proceedings; and (c) the assistance either rendered by or available from numerous third parties, including the EFCA Trustee in reorganization,[41] the United States Attorney for the Central District of California,[42] the Special Committee on Equity Funding of American Institute of Certified Public Accountants,[43] and the Illinois Director of Insurance.[44]

A position somewhere in the mean was taken by Mr. David Gold, Co-Chairman (with Mr. Corinblit) of the Plaintiffs' Steering Committee. He asserts plainly that "[t]his case was not one of overwhelming risk." In support of his position, he relies upon the factors enunciated by the objectors and listed above. He does, however, believe that "[a] fair multiple recognizing the contingent nature of the litigation, the benefit conferred, and a particular petitioning counsel's responsibilities and efficiency of performance in this litigation should be recognized by the Court." The Court as-

---

**39.** See cases cited on p. 1321 of this Opinion.

**40.** See n. 17 and accompanying text, *supra.*

**41.** The work of the EFCA Trustee resulted in the filing, on October 31, 1974, in the Reorganization Court, of a 147-page report detailing much of the fraud at EFCA. Although this report may have helped to chart the plaintiffs course, its admissibility as evidence in these proceedings is questionable. In fact, this Court refused such admittance in ruling upon a motion for partial summary judgment brought by the trading-case plaintiffs. These plaintiffs had offered it as evidence in support of their motion.

**42.** In total, the work of the United States Attorney resulted in either guilty pleas or guilty verdicts for 22 EFCA-related defendants. Nineteen defendants plead guilty and three were convicted.

**43.** A detailed report was issued by the AICPA Special Committee in February, 1975.

**44.** The Illinois Director of Insurance was primarily responsible for the EFLIC liquidation proceedings. On March 25, 1975 he filed a Plan for Liquidation and a Petition for Approval of a Plan of Liquidation of EFLIC.

sumes Mr. Gold supports a multiple of three (3), at least as to some counsel, because that is the basis upon which his fee request is made.

A review of prior judicial precedent discloses the use of multipliers of from one to five times the normal hourly rates charged. Most cases have, however, applied multipliers of less than five (5). In *Lindy II*, a multiplier of two (2) was approved. In *Grinnell I*, a multiplier of three (3) was used for most of the time expended with multipliers of two (2) applied to efforts expended in administering the settlement proceeds and one (1) applied to time spent in preparing the fee applications.[45]

In *Liebman v. J. W. Peterson Co.*, 63 F.R.D. 684 (N.D.Ill.1974), the Court applied a multiplier of one in cases where the court found duplication and waste among the group of plaintiffs.

Finally, the court in *Arenson v. Board of Trade of City of Chicago*, 372 F.Supp. 1349 (N.D.Ill.1974), applied a multiplier of four (4) to the petitioning attorneys' normal hourly rate.

■ This Court agrees with the position of Chief Judge Lord stated in *In re Penn Central Securities Litigation*, 416 F.Supp. 907, 914 (E.D.Pa.1976), that "the relevant issue is the contingent nature of the particular case involved, and not the risk factor in class actions generally." It has, therefore, been the responsibility of the Court to carefully examine the record of this case to determine what an informed lawyer would consider the risk element involved in this case.

■ Based upon a careful examination of the record, it is clear that the "lodestar" computed for many of the counsel in this case should be adjusted upward because of the contingent nature of success involved. The burden assumed by many plaintiffs' counsel throughout this litigation was a heavy one.

The efforts expended prior to transfer and consolidation of the cases by the JPML as well as the efforts expended by many counsel during the proceedings before the JPML were of a high risk nature. The great uncertainty as to the procedural posture of this massive litigation caused many counsel to decide not to actively prosecute the claims of their clients. Those counsel who did take up the laboring oar in organizing and prosecuting this litigation must now be compensated.

---

**45.** The Second Circuit recently issued *Grinnell II* in which it disallowed any doubling or trebling of the lodestar which was computed for class action counsel in that case. Although the Court agrees with the principles expressed by the Second Circuit in *Grinnell II*, it is not obligated to apply, to all counsel in this case, the conclusion reached there because the present facts before the Court regarding the activity of many of plaintiffs' counsel are easily distinguishable from those recited in *Grinnell II*. First, as distinguished from this case, the civil complaints in *Grinnell* were filed after the government had successfully prosecuted claims against the defendants. The government's prosecution, which lasted some six years resulted in detailed findings of fact and conclusions of law, and a final decree against the defendants. Second, the civil class actions for which compensation was sought in the petitions under consideration in *Grinnell* had been filed after the filing of numerous other private suits; therefore, the applicant had the benefit of the allegations contained in numerous prior complaints. Third, the applicant was not a member of the team designated by the trial judge "to carry the laboring oar in prosecuting the suits" (the "Troika"). Fourth, the applicant had not taken any depositions. Fifth, the settlement in *Grinnell* was accomplished "after only four bargaining sessions." Sixth, as opposed to the fluctuating state of the law faced by plaintiffs' counsel in this litigation, the *Grinnell* applicant had, according to the Second Circuit, the benefit of numerous prior cases which charted the course of that litigation and eliminated any novel and complex issues.

Finally, although the Second Circuit noted that the District Court in *Grinnell* was unable to justify the use of multiples "with the express factual findings and firm record support which *Grinnell I* requires," the present Opinion and record in this case are replete with specific factual evidence which justifies the multipliers employed by this Court to the work done by many counsel.

The principles of *Grinnell II* are, however, applicable to certain counsel in this litigation who remained on the sidelines and were not active in major aspects of the case. As indicated in Section V E of this Opinion, such counsel, as in *Grinnell II*, will not be awarded any multiplier.

Although the work performed by the numerous third parties to this litigation, who have been previously mentioned, surely assisted plaintiffs' counsel in charting the way, the burden fell upon plaintiffs' counsel in this case to initiate and conduct discovery in an effort to gain admissible evidence against the specific defendants involved in this case. The criminal, reorganization, and liquidation proceedings were of a different nature, possessed different focuses, and pertained to different parties.[46] Additionally, the burden fell on plaintiffs' counsel to learn and understand the business and operating practices of EFCA's varied industries,[47] as well as the specific accounting methods of EFCA.[48]

The cases against the numerous defendants were fraught with risk and involved interwoven novel and complex procedural and substantive issues. Plaintiffs' counsel were forced to argue such complex questions of fact and law in the face of unfavorable rulings such as *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Not only did the major defendants protest their culpability, but their insurance companies refused to accept any liability. Additionally, the identity of some of the defendants compounded the risk of this litigation. For example, this case represents the first securities case against an actuary.[49]

The many hours of discovery on and litigation of the claims in this case were expended by plaintiffs' counsel without any guarantee of remuneration. For nearly four years plaintiffs' counsel were required to expend large amounts for overhead costs and litigation expenses and forego acceptance of other cases. The duration of this litigation caused a lengthy delay in receipt of payment for services rendered. Having several attorneys in one firm working on one piece of litigation for a four-year period is a great financial burden for that firm.

Finally, the case has been vigorously contested by counsel for defendants. The defendants opposed much of the plaintiffs' discovery and initiated discovery of their own. They expended large amounts of time and money in arguing that they should be dismissed from this action.[50] They argued that no class action was maintainable because a uniform measure of damages was impossible under the circumstances and the size of the class made it unmanageable. The defendants' resistance to settlement made the settlement negotiations long, difficult and complicated.

The financial risk in this litigation was substantial, and the Court must take it into account. This Court does not, however, believe that the financial risk in this litigation has been the same for all counsel. To an extent, the financial risk involved in any litigation must be a factor of the amount of time, energy and expense expended by counsel without any guarantee of remuneration. Obviously, the more time, energy and expense spent the greater the financial risk. The "lodestar" should, therefore, be increased by a greater contingency factor for counsel who take up the laboring oar in litigating a complex case such as this.

**46.** The existence of the massive fraud at EFCA was not the major concern in these M.D.L. Proceedings. Plaintiffs' counsel's concern rested more with the sophisticated and complex questions of fact and law dealing with the relationships between EFCA and various third parties and whether, as a result of the relationships, and the action or inaction of these third-party defendants, liability could be fastened upon such third parties in favor of the victims of the EFCA fraud. This concern was present in no other EFCA-related proceedings and remained within the exclusive province of the plaintiffs' counsel.

**47.** The financial interests of EFCA touched such diverse industries as insurance, mutual funds, savings and loan, oil and gas, cattle operations, and even an Italian spaghetti factory.

**48.** The extensive use of complicated computer programs to perpetrate the fraud at EFCA multiplied the burden of anyone who attempted to unravel the accounting methods and auditing procedures of EFCA.

**49.** The result of the litigation of novel theories against Milliman and Robertson, Inc. was payment by them to the class of $3,000,000.

**50.** *See In re Equity Funding Corporation of America Securities Litigation*, 416 F.Supp. 161 (C.D.Cal.1976).

Specific allocations of the appropriate contingency factors to be applied in this case will be made after the discussion in this Opinion of the quality of the services rendered, and the appropriateness of increasing counsel's lodestar by an additional quality factor. One issue regarding the contingency factor must, however, be discussed at this point.

 As previously indicated in this section of the Opinion, certain of the objectors urge the Court to employ a "sliding scale" contingency factor which takes into account both the different risk inherent in different tasks and the possibility that the risk diminished as the litigation proceeded. With one possible exception, the Court must disagree with this position.

Having determined that this case involved substantial risk to counsel who were active in its prosecution, it is virtually impossible for this Court to pick some point during the past four years at which time the risk began to substantially diminish. Furthermore, it would be an impossible task for this Court to assign different risk values to the thousands of tasks which have been performed.[51] Such an expenditure of judicial resources is neither suggested nor compelled by previous judicial precedent.

 An exception lies in the area of claims administration. This activity occurs at the end of the litigation at a point where everyone, including counsel, agrees that the risk of the litigation is either minimal or nonexistent. No contingency factor, should, therefore, be applied to counsel's time for efforts expended in this area.

### D. *The Quality Factor*

The Court in *Lindy II* indicated that a court, in passing upon an attorney's fee application, may consider the quality of an attorney's work and increase or decrease the "lodestar" calculation. First, the court noted that the quality and contingency factors should be separately considered:

"Finally, we underscore that once a district court determines the 'lodestar' it should inquire *separately* into the contingency and quality factors and make specific findings of fact as to each." 540 F.2d 117 (emphasis in original).

Next, the court accurately described the considerations involved in this factor as follows:

"Under the rubric of 'the quality of an attorney's work', the court should appraise the manner in which counsel discharged his or her professional responsibilities. The district court may use this factor to increase or decrease the 'lodestar' calculation.

"As a first principle, the court must recognize that a consideration of 'quality' inheres in the 'lodestar' award: counsel who possess or who are reputed to possess more experience, knowledge and legal talent generally command hourly rates superior to those who are less endowed. Thus, the quality of an attorney's work *in general* is a component of the reasonable hourly rate; this aspect of 'quality' is reflected in the 'lodestar' and should not be utilized to augment or diminish the basic award under the rubric of 'the quality of an attorney's work'.

"*Lindy I,* then, permits an adjustment to the 'lodestar'—up or down—based on the all-round performance of counsel in the specific case: 'Any increase or decrease in fees to adjust for the quality of work is designed to take account of an unusual degree of skill, be it unusually poor or unusually good.' 487 F.2d at 168. By this is meant simply that the district court may determine that the lawyer discharged the professional burden undertaken with a degree of skill above or below that expected for lawyers of the caliber reflected in the hourly rates. As previously rehearsed, we do not intend

---

51. Somewhat akin to this suggestion by the objectors is the Court's decision not to apply an "across-the-board" contingency factor to all counsel in this case, but to apply differing contingency factors. Different factors will be employed depending upon the position of counsel in the litigation and *the type of tasks performed.* This alternative procedure should satisfy many of the objectors' concerns.

that this evaluation entail a detailed analysis of the lawyer's performance in each category of services rendered. Rather, the increase or decrease reflects exceptional services only; it may be considered in the nature of a bonus or penalty. The heavy burden of proving entitlement to such an adjustment is on the moving party.

"In determining whether to adjust the 'lodestar' for quality work or not, the district court may consider, inter alia:

"1. The result obtained by verdict or settlement, evaluated in terms of (a) the potential money damages available to the class member, i. e., a comparison of the extent of possible recovery with the amount of actual verdict or settlement; (b) the benefit—monetary or non-monetary—conferred on the class, i. e., permitting the court 'to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested . . . .'

"2. An evaluation of the professional methods utilized in processing the case,—rewarding the use of efficient methods to expedite the case and penalizing the use of methods the predominant purpose of which was to delay or obstruct the proceedings.

"If, on the basis of the quality of services rendered, the court is persuaded that an increase or decrease in the 'lodestar' is warranted, it should identify those factors supporting its conclusions, state the specific amount by which the basic fee should be altered due to the quality of work and give a brief statement of reasons therefor." 540 F.2d at pp. 117–118.

Many of the factors discussed in the preceding section on the contingency factor apply here. Thus, for example, consideration of the novelty and complexity of the issues raised is important in determining both the risk of the litigation and the quality of the attorneys' work. The comments stated above will not, however, be repeated here.

Most of the attorneys for plaintiffs are experienced and able lawyers and this was reflected in the quality of their work. Moreover, plaintiffs' attorneys in this class action have been up against established and skillful defense lawyers, and should be compensated accordingly. Finally, there is no doubt that the expertise of many of these counsel contributed to both a substantial saving of expense for the class and a maximization of the ultimate recovery.

The Court must, however, analyze the quality of the performance of the various lawyers individually because, just as the risk of the litigation may vary from counsel to counsel, so to may the quality of the work. The quality of the work performed is a function of various factors, but it necessarily includes the difficulty of the task performed. Thus, the more impressive the task undertaken, the more impressive the final successful product may be.

### E. The Appropriate Multipliers for Plaintiffs' Counsel in This Case

Based upon a careful examination of the record in this case, as well as the Court's intimate knowledge of these proceedings, and in consideration of the responsibilities, contribution, risk, and nature and quality of the services rendered, the Court is prepared to set the general multipliers to be applied to plaintiffs' counsel's applications in this case. Based upon these factors, roughly four categories of plaintiffs' counsel can be discerned.

The first category consists of two attorneys who organized, directed and supervised virtually every aspect of this litigation, Messrs. Grossman and Corinblit. Their efforts and contributions are briefly discussed below. The Court finds it fair, just, and reasonable to multiply the lodestar computed for these two counsel by a composite multiplier of three (3). Two-thirds of this multiplier represents the Court's determination as to the risk of the litigation for these counsel, and one-third of the multiplier represents the Court's evaluation of the nature and quality of the services rendered.

■ The second category consists of numerous other counsel of partnership status who were members of the Plaintiffs' Steering Committee *and* active in many of the major aspects of this case. These counsel did not remain on the sidelines during this litigation, but rather took primary responsibility for major aspects of the case. The Court finds it fair, just, and reasonable to multiply the lodestar computed for counsel whose efforts fall within this category by a composite multiplier of two. One-half of this multiplier represents the Court's determination as to the risk of the litigation for these counsel, and one-half of the multiplier represents the Court's evaluation of the nature and qualify of the services rendered.

■ The third category consists of the associates in the law firms of those counsel who were primarily responsible for the active prosecution of this case. Since the risk was less for these counsel, and since their limited experience is usually reflected in lower quality of work, the Court finds it fair, just, and reasonable to multiply the lodestar computed for counsel whose efforts fall within this category by a composite multiplier of one and one-half (1½). One-half of this multiplier represents the Court's determination as to the risk of the litigation for these counsel, and one-half of the multiplier represents the Court's evaluation of the nature and quality of the services rendered.

■ The fourth category consists of some counsel who, although they deserve to be compensated for the portion of their time which benefited the class members, spent much of their time on the sidelines of this litigation. These counsel were active in only limited respects and did not have primary responsibility for major aspects of the litigation. Such counsel will have a

multiplier of one applied to their lodestar figure.

### F. The Individual Applications of Plaintiffs' Counsel in This Litigation

With all of the above background, the Court is prepared to analyze and discuss each of the thirty-two applications which have been filed by plaintiffs' counsel in this litigation.

#### 1. *Schwartz, Alschuler & Grossman*

As indicated in Section V E above, Mr. Marshall Gorssman was one of two counsel who organized, directed and supervised virtually every aspect of this litigation. Since July, 1974 he has served as Plaintiffs' Liaison Counsel on the Plaintiffs' Steering Committee. In addition to his active prosecution of this action, he served numerous valuable functions which were outlined by the Court in General Management Order No. 1.[52] Mr. Grossman and/or other members of his firm had an instrumental role in all major aspects of this litigation, including the proceedings before the JPML, the discovery against the major defendants, the Rule 12 and 23 proceedings, and the settlement negotiations.

In its initial fee application, filed on March 1, 1977, the applicant seeks compensation for a total of 9,184.75 hours expended by personnel in these MDL proceedings. Of these hours, 3,826 were spent by Marshall Grossman. As compensation for the services outlined in this application, Schwartz, Alschuler & Grossman requests $3,650,000 in attorneys' fees. The initial application of Schwartz, Alschuler & Grossman sought fees for services performed from April 1, 1973 through February 28, 1977. At the evidentiary hearing on May 10, 1977, the applicant filed a "Supplemental Affidavit

---

**52.** General Management Order No. 1 read, in part, as follows:

"Liaison counsel shall maintain lists of plaintiffs and their addresses and lists of plaintiffs' counsel and their addresses. The Liaison Counsel will be responsible for receiving and distributing to his liaison group all notices, orders, and other communications from the Court. He shall keep complete files of all

material thus received, and he will make that material available for inspection. In addition, the Liaison Counsel shall assist the Steering Committee in the maintenance of communication among attorneys and in the coordination of the efforts of plaintiffs' counsel. He shall also perform whatever functions may be assigned to him by the Steering Committee."

of Marshall B. Grossman in Support of Award of Reasonable Attorneys' Fees and Reimbursement of Expenses." This supplemental application seeks fees for services rendered from March 1, 1977 through April 30, 1977. In this application, the law firm seeks compensation for a total of 285.20 hours of attorneys' and paralegals' time. The award that follows includes careful consideration by the Court of this supplemental affidavit. In support of their exhaustive and thorough fee petitions, Schwartz, Alschuler & Grossman have filed, among other things, a schedule and summary of the recorded time spent by the firm in these MDL proceedings, the actual time slips from which the summary was prepared, and schedules reflecting the value of the time spent in these proceedings if billed at either the firm's historic hourly rates or its current hourly rate.

Based upon a careful review of the services rendered by this firm, as reflected in the fee application and the supplemental affidavit, and upon consideration of both the objections to and the comments in support of the application, the Court finds it fair, just and reasonable to award fees to the law firm of Schwartz, Alschuler & Grossman, in the amount of $1,718,219.37. This composite amount is the result of multiplying partners' reasonable, historic hourly rates by a multiple of three,[53] multiplying associates' reasonable historic hourly rates by a multiple of one and one-half[54] and multiplying paralegals' and law clerks' reasonable historic hourly rates by a multiple of one.

[40] Schwartz, Alschuler & Grossman further apply to the Court for reimbursement of out-of-pocket costs and expenses in the amount of $44,459.28.[55] The Court finds these expenses to be reasonable in amount, for use in the prosecution of the class actions in this litigation, adequately supported by the documentary confirmation supplied, and necessary to enable plaintiffs to prosecute their claims. The request is, therefore, approved.

### 2. Corinblit & Shapero

As indicated in Section V E above, Mr. Jack Corinblit acted with Marshall Grossman in organizing, directing and supervising virtually every aspect of this litigation. Since July, 1974 he has served as Co-Chairman of Plaintiffs' Steering Committee. The efforts expended by Mr. Corinblit parallel the efforts of Mr. Grossman in importance and in the benefit they produced for the members of the classes. Since they are adequately and accurately detailed in the fee application and etched on the entire record of this case, they will not be repeated here.

In its initial fee application, filed March 4, 1977, the law firm seeks compensation for a total of 6,767 hours expended by personnel in these M.D.L. proceedings.[56] Of these

---

**53.** Except for 161.75 hours spent by Mr. Grossman in 1977. This time was spent by Mr. Grossman in the areas of claims administration (6.5 hours) and fee application preparation (155.25). As previously indicated, the Court finds it unreasonable to compensate counsel for time spent on preparing the fee application or to apply any multiplier to the lodestar computed as compensation for efforts expended in the area of claims administration. *See* n. 36, *supra.*

**54.** Except for 185.25 hours spent by Robert Schlachter in 1977. This consists of 25.75 hours in the area of claims administration and 159.50 hours in preparation of the fee application. As previously indicated, no reimbursement for time spent in preparing the fee application is awarded and no multiplier is applied

to the compensation for efforts expended on claims administration.

**55.** The total unreimbursed costs and expenses paid by the firm through April 30, 1977 was $97,576.07. The amount which constitutes the difference between $97,576.07 and $44,459.28 has been sought in other applications. The amount under present consideration was fully and completely supported with all underlying documentation, filed August 30, 1977.

**56.** A careful review by the Court of the "Appendix to Affidavit of Jack Corinblit on Behalf of Corinblit and Shapero in Support of Award of Reasonable Attorneys' Fees and Reimbursement of Expenses," disclosed a clerical error which resulted in an overstatement of the hours spent by Mr. Corinblit in this litigation in 1975. This error caused 53.5 hours to be re-

hours, 3,463.75 were expended by Jack Corinblit. As compensation for the services outlined in this application, Corinblit & Shapero requests $3,226,305 in attorneys fees. The initial application of Corinblit & Shapero sought fees for services performed from April 1, 1973 through February 28, 1977. On August 19, 1977, the applicant filed a Supplemental Affidavit of Jack Corinblit in which additional fees for services rendered from March 1, 1977 through April 30, 1977, and additional reimbursement for out-of-pocket costs and expenses were requested. In this supplemental affidavit, the law firm seeks compensation for a total of 689.50 hours of attorneys' and a paralegal's time and reimbursement for expenses in the amount of $10,210.23. The award that follows includes careful consideration, by the Court, of this supplemental affidavit. In support of their exhaustive and thorough fee applications, Corinblit & Shapero have filed, among other things a schedule and summary of the recorded time spent by the firm in these proceedings, the actual time slips from which the summary was produced, and schedules reflecting the value of the time spent in these proceedings if billed at either the firm's historic hourly rates or its current hourly rate.

█ Based upon a careful review of the services rendered by this firm, as reflected in the fee applications, and upon consideration of both the objections to and the comments in support of the application, the Court finds it fair, just and reasonable to award fees to the law firm of Corinblit & Shapero in the amount of $1,394,034.37 and $10,210.23 as reimbursement of reasonable out-of-pocket costs and expenses. The composite amount awarded as attorneys' fees is the result of multiplying Mr. Corinblit's

reasonable historic hourly rates by a multiple of three,[57] multiplying his associate's reasonable, historic hourly rates by a multiple of one and one-half,[58] and multiplying a paralegal's reasonable historic hourly rates by a multiple of one.

### 3. *Wolf Popper Ross Wolf & Jones*

This firm has been active in the prosecution of EFCA-related claims since it filed a series of lawsuits in April, 1973. Among these were the first suits filed on behalf of EFCA stock purchasers against certain trading defendants.[59]

On July 19, 1973, Mr. Philip Jones, a partner in the applicant firm, was appointed by the Honorable Lee P. Gagliardi, as Plaintiffs' Ex-Officio Liaison Counsel for all EFCA-related cases instituted in the Southern District of New York. When the New York Plaintiffs' Steering Committee was organized, on September 5, 1973, Mr. Jones was elected Co-Chairman of the Committee. In such positions, Mr. Jones performed numerous tasks in New York prior to transfer of the cases to this Court. These included the preparation and filing of one of the four Unified Consolidated Class Action Complaints, the preparation of opposition to Rule 12 motions filed in New York by certain defendants, and the presentation of briefs to the JPML.

After the transfer and consolidation of all the actions by the JPML, Mr. Jones was elected to the Plaintiffs' Steering Committee and has served on the Committee since 1974. Mr. Jones' firm was designated by Plaintiffs' Steering Committee with the task and responsibility for prosecuting all the class action trading claims in this MDL litigation. These claims were made on be-

---

corded twice; therefore, a reduction of 53.50 hours must be made in the total hours spent by the firm and the hours spent by Mr. Corinblit in 1975. The total hours actually spent by the firm is, therefore, 6,713.50. Mr. Corinblit recognized and admitted the error during the evidentiary hearing on these applications.

**57.** Except for 126.75 hours of Mr. Corinblit's time; 80.25 hours of this time were spent preparing the fee applications while approximately

46.50 hours were spent in settlement administration. *See* nn. 36 and 51, *supra.*

**58.** Except for 150.25 hours of Mr. Seltzer's time; 109 of these hours were spent preparing the fee applications while approximately 41.25 hours were spent in settlement administration. *See* nn. 36 and 51, *supra.*

**59.** *See* pp. 1314–1315, *supra*, for a description of the claims in the trading cases.

half of Subclass Five in this litigation. This vigorous prosecution included taking numerous key depositions, preparing a portion of plaintiffs' reply memoranda in support of Plaintiffs' Rule 23 Class Action Certification Motion, and preparing and arguing an important motion for partial summary judgment. This firm was also assigned the major responsibility for settlement negotiations with the trading defendants.

The law firm seeks compensation for a total of 5,285 hours (4,732 hours for attorneys and 553 hours for paralegals) expended by personnel in these MDL proceedings.[60] The time expended by this firm was exceeded only by that of the firms of Marshall Grossman and Jack Corinblit. As compensation for the services rendered in this litigation, Wolf Popper Ross Wolf & Jones requests $1,300,000 in attorneys' fees and reimbursement of disbursements in the sum of $45,088.78.[61] The applicant has filed all the necessary and required underlying documentation in support of its fee request.

[42] Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of the comments in support of the application,[62] the Court finds it fair, just and reasonable to award fees to the law firm of Wolf Popper Ross Wolf & Jones in the amount of $713,597.50. This composite amount is the result of multiplying part-

ners' reasonable, historic hourly rates by a multiple of two,[63] multiplying associates' reasonable, historic hourly rates by a multiple of one and one-half,[64] and multiplying paralegals' reasonable, historic hourly rates by a multiple of one.

■ The above computations exclude any compensation to Mr. Sheldon P. Barr. See n. 60, supra. Although Mr. Barr may have performed a substantial service to Wolf Popper by referring his client to them, the Court finds no basis in fact for the claim that he rendered services that benefited the members of the classes involved in this litigation. It is to Wolf Popper that he must turn if he feels entitled to any compensation.

A major issue raised with respect to this application involved the question of whether some apportionment of the fee requested should be made in allowance for the fact that a substantial portion of the efforts expended by this applicant primarily benefited only the members of the Sub-Class V, the trading class plaintiffs. During the evidentiary hearing, it appeared to be the consensus of plaintiffs' counsel, including Messrs. Grossman, Corinblit and Jones, that a reasonable apportionment should be made.

■ The record clearly indicates, however, that some of the services performed by Wolf Popper benefited not only the class

---

**60.** This time, as well as Wolf Popper's application, includes a request for compensation for 119 hours expended by Sheldon P. Barr. Mr. Barr is not a member of the Wolf Popper firm; however, he played a principal role in their early participation in this litigation.

The record indicates that on March 23, 1973, Mr. Barr contacted the Wolf Popper firm on behalf of his client, a purchaser of EFCA stock, and asked Wolf Popper to investigate the client's rights with respect to his purchase of EFCA stock. Subsequently, Wolf Popper filed a class action suit on behalf of Mr. Barr's client and others who were similarly situated. This was one of the first class action trading cases filed in this litigation.

The record further indicates that Mr. Barr also filed a general fraud class action on behalf of his client and continued to prosecute that action until the transfer of all cases to California. Finally, the Wolf Popper application discloses a fee arrangement with Mr. Barr whereby the

latter is entitled to 10% of the fees awarded to the former. Exhibit D–1 to Affidavit of Philip Jones.

**61.** The request for reimbursement of out-of-pocket costs and expenses has been mooted by the previously-mentioned order of the Court, filed July 29, 1977, which awarded the applicant $52,844.41. See n. 25, supra.

**62.** No objections were filed by anyone to either the amount of time spent by the members of this firm or the amount of the fee requested.

**63.** Except 78 hours spent by the partners in preparing the fee application. See nn. 36 and 51, supra.

**64.** Except 107 hours spent by Mr. Levy, an associate, in preparing the fee application. See nn. 36 and 51, supra.

members whose interests they represented, but benefited the members of other classes as well. With this in mind, and on the basis of a careful review of the services performed by this applicant, plaintiffs' counsel suggested that an appropriate apportionment would be 75% (efforts benefited primarily Subclass V plaintiffs) and 25% (efforts benefited other class members). The Court agrees with the analysis of plaintiffs' counsel and will, therefore, order that 75% of the fees awarded to this applicant ($535,-198.13) be paid from the $4 million settlement fund generated in the settlement of the trading class cases and that 25% of the fees awarded ($178,399.37) be paid from the remainder of the $60 million settlement fund.

### 4. *Kreindler & Kreindler*

Throughout the course of this litigation Mr. Paul M. Bernstein, a partner in Kreindler & Kreindler, has served as a member of Plaintiffs' Steering Committee. By Order of this Court, he was designated Special Counsel to the Committee. His participation in this litigation was extensive and unparalleled by any other counsel except Messrs. Grossman, Corinblit and Jones. In fact, during the cross-examination of Mr. Grossman conducted during the two-day evidentiary hearing, Mr. Bernstein was accurately described as "one of the mainstays of our leadership team." [65]

Mr. Bernstein played an instrumental role in several major aspects of this litigation, including the preparation and argument of plaintiffs' class action certification motion, the written and oral discovery of the accounting firm of Haskins & Sells and the underwriter defendants, and the settle-

ment negotiations with the underwriter defendants. The services rendered by Mr. Bernstein and other members of the firm were of substantial benefit to the members of the class.

The law firm seeks compensation for 4,045 hours of attorneys' time spent in prosecuting this action. Of these hours, 2,436 were expended by Mr. Bernstein. As compensation for the services rendered in this litigation, Kreindler & Kreindler requests $1,200,000 in attorneys' fees. As was the case with the previously-discussed applications, this firm has filed all the appropriate and necessary underlying documentation in support of the requested fee.

■ Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of both the objections to [66] and the comments in support of their fee application, the Court finds it fair, just and reasonable to award fees to the law firm of Kreindler & Kreindler in the amount of $800,-679.37. This composite amount is the result of multiplying partners' reasonable, historic hourly rates by a multiple of two [67] and multiplying associates' reasonable, historic hourly rates by a multiple of one and one-half.[68]

### 5. *David B. Gold*

Mr. David B. Gold has been a Co-Chairman, along with Mr. Corinblit, of the Plaintiffs' Steering Committee since the formation of that Committee. Although Mr. Gold was active in certain of the key aspects of this litigation, he chose not to participate in,[69] or was not needed in, many of the

---

**65.** Reporter's Transcript, p. 63, line 4.

**66.** Although some of the objections filed referred, in a general manner, to the Kreindler & Kreindler fee application, no specific objections to this application were filed.

**67.** Except for 37.25 hours spent by Mr. Bernstein in preparing the fee application. *See* ns. 36 and 51, *supra.*

**68.** Except for 19.75 hours spent by Mr. Edward Gross in preparing the fee application. *See* ns. 36 and 51, *supra.*

**69.** The record indicates that Mr. Gold's active involvement in numerous other class actions, during the pendency of the present case, may have prevented him from devoting substantial efforts to this case. His fee application indicates that he has been actively involved in litigating the following actions: Since May, 1976, Mr. Gold has expended 22.25 hours in *In re Folding Carton Antitrust Litigation*; since April, 1975, he has expended 444 hours in *In re Consolidated Pretrial Procedures in Air West Securities Litigation*; since September, 1975, he has expended 1033.50 hours in *Catena v.*

aspects of this case. The limited participation of his firm is reflected in fact that the compensation is sought for only 1,696.50 hours of attorneys' time and 101.25 hours of paralegal time. The major areas of participation by this applicant include presenting arguments to the JPML, drafting the First Amended Unified and Consolidated Complaint, and, despite the fact that he neither conducted nor reviewed any of the discovery in this case, assisting in certain major settlement negotiations.

As compensation for the services rendered in this litigation, David B. Gold requests $818,683.00 in attorneys' fees and reimbursement of costs and expenses in the sum of $18,719.36.[70] The applicant has filed all the necessary and required underlying documentation in support of his fee request.

■ Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of both the objections to and the comments in support of the application, the Court finds it fair, just and reasonable to award fees to David B. Gold and his law firm in the amount of $230,540.00. This composite amount is the result of multiplying (a) Mr. Gold's reasonable amount of hours spent by the reasonable hourly rate of $100 per hour;[71] (b) Mr. Gold's lodestar fee by a multiplier of two; (c) Mr. Gold's

associate's reasonable amount of hours spent by the reasonable hourly rate of $50 per hour; (d) Mr. Gold's associate's lodestar by a multiplier of one and one-half; and (e) Mr. Gold's paralegal's hours spent by the reasonable hourly rate of $20 per hour.

■ A careful review of Mr. Gold's application has resulted in reductions of the amount of hours for which compensation is claimed by Mr. Gold and his associate, Mr. Paul F. Bennett. The reductions were made to compensate for several problems contained in the fee application.

First, the time sheets filed in support of the fee application contained numerous errors. On many occasions, the time recorded for meetings with other counsel was substantially greater than the time recorded and filed by other counsel in attendance at those meetings. In certain other instances, time was spent on items listed which bear no relationship to this litigation.

Second, Mr. Gold appears to seek compensation for his travel time between San Francisco and Los Angeles, at the premium rate of $600 per hour.

Third, some of Mr. Gold's time was spent reviewing the work done by Messrs. Grossman and Corinblit or Mr. Gold's local counsel, Mr. Furman. Such efforts were, on occasion duplicative and overlapping.

Capitol Industries, Inc.; since February, 1973, he estimated having spent 4,830 hours in *Mattel* litigation; since April, 1973, he has expended 1189.70 hours in the *Holiday Magic* litigation; since August, 1976, he has expended 116.-50 hours in *In re Gap Stores Securities Litigation*; since March, 1971, he has expended 607.-75 hours in *Green v. Occidental*; since January, 1976, he has expended 338.25 hours in *Piva v. Xerox Corp.*; between 1971 and 1975 he expended approximately 1,837 hours in the *Memorex* litigation; between March, 1973 and March, 1976, he expended 276 hours in *Herzog v. San Jose Waterworks*; from 1971 through 1975 he expended 1,189 hours in the *Snack Foods* litigation; and since December, 1974, 320 hours in *In re Sugar Industry Antitrust Litigation.*

70. On August 19, 1977, pursuant to an Order of the Court (*See* n. 25, *supra*), Mr. Gold filed a supplemental petition for reimbursement of out-of-pocket costs and expenses which supersedes all prior requests for reimbursement in

this case. Since a supplemental Order of this Court will be issued at a future date, no award for costs and expenses will be made at this time.

71. Mr. Gold requested that his fee be computed at his current hourly rate of $200 per hour, and Mr. Gold failed to provide the Court with direct information as to the historic hourly rates of the members of his firm. The Court has some familiarity with those rates, however, because of a recent fee request by Mr. Gold in the *Mattel* securities case which was proceeding in this Court, and because of Mr. Gold's fee requests in other cases. Using this information and the historic hourly rates of other counsel, the Court has applied an approximate weighted-average rate in computing the applicant's lodestar. Thus, Mr. Gold's lodestar is computed at $100 per hour, his associate's lodestar is computed at $50 per hour, and his paralegal's lodestar is computed at $20 per hour.

Fourth, some of Mr. Gold's time was spent on claims by his client in a non-integrated action against Fidelity Corporation. Such efforts were of little or no benefit to the members of the class, since the claims were ultimately dismissed as being without merit.

Finally, numerous hours were spent by Mr. Gold and Mr. Bennett in preparing the fee application. As previously indicated in this Opinion such efforts are not compensable out of the settlement fund.

### 5a. *Stanley A. Furman*

As previously indicated in this Opinion,[72] Mr. Furman acted as local counsel for Mr. Gold. In this capacity, he assisted Mr. Gold by filing pleadings, making court appearances, and attending meetings and conferences of counsel. Mr. Furman requests compensation in the amount of $33,060.00 for 275.5 hours devoted to this litigation. In support of his request, Mr. Furman filed his time sheets and an affidavit.

Although some of the efforts expended by Mr. Furman benefited the class and resulted in reducing the cost to the class of Mr. Gold's services, many of Mr. Furman's efforts overlapped and were duplicative of the efforts of other counsel. Reductions in Mr. Furman's requested time must, therefore, be made.

■ Based upon a careful review of the services rendered by Mr. Furman, as reflected in Mr. Gold's fee application and Mr. Furman's time sheets, the Court finds it fair, just and reasonable to award fees to Mr. Furman in the amount of $6,650.00. This composite amount is the result of multiplying the reasonable amount of hours spent by Mr. Furman in this litigation by the reasonable hourly rate of $50, and multiplying the lodestar computed by a multiplier of one.

### 5b. *Milberg & Weiss*

Milberg Weiss Bershad & Specthrie (formerly Milberg & Weiss), who originally represented Mr. Gold's client, Mr. Stanley Ferber, prior to referring the case to Mr. Gold, petition the Court for attorneys' fees in the sum of $35,990, based upon services which they assert benefited the members of the classes in this litigation. The applicant also seeks reimbursement of costs and expenses in the sum of $486.24.

■ Since the Court finds no basis in fact for the claim that the firm rendered services that benefited the members of the classes involved in this litigation or contributed to the settlement fund, their request for attorneys' fees and costs is denied.

### 6. *Kohn, Savett, Marion & Graf, P. C.*

Although Mr. Harold E. Kohn was a member of the Plaintiffs' Steering Committee, the record indicates that few major tasks were undertaken by him personally. In fact, the major tasks performed by this firm were accomplished primarily by two associates, Messrs. Wayne M. Thomas and Allen D. Black. Of the total hours for which compensation is sought by this firm (3,514.25), 232.50 were spent by Mr. Kohn, 2,066.25 by Mr. Thomas and 572.50 by Mr. Black.

There is no doubt that the work of this law firm benefited the members of the classes in this litigation. Such work included assistance in the preparation of First Amended Unified and Consolidated Complaint and assistance in the discovery against the major accounting defendants. The special expertise of Mr. Thomas, who is an accountant as well as a lawyer, was of substantial value to plaintiffs' counsel in this case. As compensation for the services rendered in this litigation, Kohn, Savett, Marion & Graf, P. C. requests $750,000 in attorneys' fees and $40,938.88 as reimbursement for out-of-pocket costs and expenses.[73]

---

**72.** *See* n. 26, *supra*.

**73.** On August 17, 1977, pursuant to an Order of the Court, this applicant filed a supplemental petition for reimbursement of out-of-pocket costs and expenses which supersedes all prior requests for reimbursement. Since a supplemental Order of this Court will be issued at a future date, no award for costs and expenses will be made at this time.

■ Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of both the objections to and the comments in support of their fee application, the Court finds it fair, just and reasonable to award fees to the law firm of Kohn, Savett, Marion & Graf, P. C. in the amount of $383,208.75. This composite amount is the result of multiplying partners' reasonable, approximate weighted-average historic hourly rates by a multiple of two, multiplying associates' reasonable, approximate weighted-average historic hourly rates by a multiple of one and one-half, and multiplying paralegals' and law clerks' reasonable, approximate weighted-average historic hourly rate by a multiple of one. The Court has not awarded compensation for 31.25 hours spent in preparation of the fee petition.

### 7. *Fine, Kaplan and Black*

As indicated in the preceding section, Mr. Allen D. Black was employed in the firm of Kohn, Savett, Marion & Graf, P. C. during the first two years of this litigation. This application is based solely on the efforts expended by the members of Fine, Kaplan and Black since March 31, 1975 and, therefore, does not include the efforts of Mr. Black which were expended during his association with the Kohn firm.

Since leaving the Kohn firm, in March, 1975, Mr. Black has been a member of Plaintiffs' Steering Committee and has been active in numerous major aspects of this litigation. The efforts of his firm included the argument for all plaintiffs in opposition to the defendants' Rule 12 motions, the preparation of the Rule 23 motion, and the discovery of numerous defendants, including, Wolfson, Weiner, Ratoff & Lapin, Seidman & Seidman, Joseph Frog-gatt & Co., Coopers & Lybrand and Milliman & Robertson. In total, Mr. Black personally conducted the depositions of 30 witnesses and attended and assisted at the depositions of 14 others. Mr. Black possessed one of the laboring oars in this litigation, both before and after he left the Kohn firm.

In total, the members of this firm and their co-counsel expended 2,646.25 hours in this litigation. Of this time, 2326.50 hours were personally spent by Mr. Black. For their efforts, counsel seek $675,000 in attorneys' fees and $50,845.50 as reimbursement for out-of-pocket costs and expenses.[74] The applicant filed all the appropriate and necessary underlying documentation in support of the requested fee.

■ Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of the comments in support of their fee application, the Court finds it fair, just and reasonable to award fees to the law firm of Fine, Kaplan and Black in the amount of $413,063.75 and $23,316.99 as reimbursement of reasonable costs and expenses. The composite amount awarded as attorneys' fees is the result of multiplying partners' reasonable, historic hourly rates by a multiple of two,[75] multiplying an associate's reasonable, historic hourly rate by a multiple of one and one-half, and multiplying co-counsels' reasonable, approximate weighted-average historic hourly rate by a multiple of one.[76]

### 8. *Sachnoff, Schrager, Jones & Weaver, Ltd.*

Lowell E. Sachnoff has served as an active member of the Plaintiffs' Steering Committee since 1974. The activities of Mr.

---

**74.** Of the $50,845.50 requested, $25,521.64 was the subject of a previous request. The previous request was ruled upon by order of the Court, filed July 29, 1977. Thus, applicant seeks the balance of $25,323.86. $1,500.00 of this latter amount is for "estimated future expenses." The Court will not consider this portion of the request at this time; the applicant may reapply, however at a future date.

**75.** Except for 40 hours spent by Mr. Black in preparing the fee application. No compensation is awarded for this time.

**76.** Mordecai Rosenfeld has been compensated at $75 per hour, while William Rosensweig has been compensated at $65 per hour.

Sachnoff and the members of his firm included, among other things, either sole or significant responsibility for the discovery on several of the most difficult claims in the litigation, including claims against Peat, Marwick, Mitchell & Co., Dishy Easton Company, The State of Illinois, and The American and New York Stock Exchanges. The services of this firm were of substantial benefit to other plaintiffs' counsel as well as to the members of the classes in this litigation.

In total, through February, 1977, the members of this firm expended 1,347.50 hours of attorneys' time and 54 hours of paralegal time in this litigation. Of this time, over 80% (950.50 hours) was spent by Mr. Sachnoff. As compensation for their efforts, counsel seek, in their original application, $473,752 in attorneys' fees and $24,-892.11 as reimbursement for out-of-pocket costs and expenses.[77]

In a supplemental application, received by the Court on May 24, 1977, Sachnoff, Schrager, Jones & Weaver, Ltd. seeks attorneys' fees and expenses incurred through April 30, 1977. In this supplemental application, an additional fee of $42,512 was requested, based upon an expenditure of 120 hours of attorneys' time and 22.50 hours of paralegal time. Of the time recorded, 23.50 hours of attorneys' time and 9 hours of paralegal time were spent on preparation of the fee application. No compensation will be awarded for this latter time.

The total fees requested by this firm in both applications is $516,264.

 Based upon a careful review of the services rendered by this firm, as reflected in both the original and supplemental fee applications, and upon consideration of the comments in support of their fee applica-

tion, the Court finds it fair, just, and reasonable to award fees to the law firm of Sachnoff, Schrager, Jones & Weaver, Ltd. in the amount of $298,479.36. This composite amount is the result of multiplying partners' reasonable, historic hourly rates by a multiple of two, multiplying associates' reasonable, historic hourly rates by a multiple of one and one-half, and multiplying paralegals' reasonable, historic hourly rates by a multiple of one.

### 9. *Kass, Goodkind, Wechsler & Gerstein*

This firm has been active in this litigation since April, 1973 when it filed the first private lawsuit against EFCA. Mr. Stuart Wechsler was one of three Co-Chairmen of the New York Plaintiffs' Steering Committee and, in that position, actively organized and prosecuted the litigation prior to transfer and consolidation by the JPML.

After the transfer of the actions by the JPML, Mr. Wechsler became a member of the Plaintiffs' Steering Committee. He has acted in that capacity throughout this litigation. The activities of Mr. Wechsler and the other members of his firm which provided a benefit to the members of the classes in this litigation included, among others, the active participation on discovery teams designed to elicit discovery from Dishy-Easton, EFCA's underwriters and the trading and Riordan defendants.

The law firm seeks compensation for a total of 1,586.25 hours of attorneys' time spent in prosecuting this action. As compensation for the services rendered in this litigation, Kass, Goodkind, Wechsler & Gerstein requests $420,000 in attorneys' fees and $24,516.46 as reimbursement of out-of-pocket costs and expenses.[78] The applicant has filed all the necessary and required

---

77. The reimbursement request of $24,892.11 includes $17,602 which had been the subject of a previous request. A supplemental application, filed by this firm on May 24, 1977, requested an additional $1,872 in expenses. Since the Court will issue a supplemental Order in the near future, and since the Court is waiting for further documentary substantiation of the expenses requested, no award will be made at this time.

78. Insufficient underlying documentary evidence in support of the request for reimbursement was supplied to the Court; therefore, no award will be made at this time. Applicant may reapply, within 20 days from the date below, and file such documentation that is consistent with and contemplated by the Court's Order, dated July 29, 1977, in these proceedings.

underlying documentation in support of its fee request.

■ Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of the comments in support of their fee application, the Court finds it fair, just and reasonable to award fees to the law firm of Kass, Goodkind, Wechsler & Gerstein in the amount of $264,550.62. This composite amount is the result of multiplying partners' reasonable, historic hourly rates by a multiple of two,[79] and multiplying associates' reasonable, historic hourly rate by a multiple of one and one-half.

### 10. Diamond, Tilem & Colden

Although this applicant was not involved in the major aspects of this litigation, its attorneys performed some valuable services for the members of the classes in this case. Such services included an extensive debriefing of a defendant, Sam Lowell, participation in bankruptcy proceedings involving an auditor, Sol Block, from whom evidence was obtained, and assistance in other discovery.

The law firm seeks compensation for 736.3 hours of attorneys' and law clerks' time in prosecuting this action. Of these hours, 356.3 were spent by Mr. Herbert Colden. As compensation for the services rendered in this litigation, Diamond, Tilem & Colden requests $150,000 in attorneys' fees and $9,681.58 as reimbursement of out-of-pocket costs and expenses.[80]

■ Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of the comments in support of the application, the Court finds it fair, just and reasonable to award fees to the law firm of Diamond, Tilem & Colden in the amount of $80,613.00. This composite amount is the result of multiplying partners' reasonable, historic hourly rates by a multiple of two,[81] multiplying associates' reasonable, historic hourly rates by a multiple of one and one-half, and multiplying law clerks' reasonable, historic hourly rate by a multiple of one.

### 11. Irsfeld, Irsfeld & Younger

This law firm provided representation to a class of plaintiffs in this litigation who would have otherwise been without any representation. This class, designated Settlement Class A, included all purchasers of 5¼% subordinated debentures (unlisted) due 1989, and 7½% subordinated notes due 1974, issued by Equity Funding Capital Corporation, N.V., and guaranteed by EFCA.[82] This class remained unrepresented until Irsfeld, Irsfeld & Younger filed a class action complaint on March 19, 1976. For a certain period prior to March, 1976, and since that date, the applicant has actively protected the rights of these class members.

The law firm seeks compensation for approximately 443.5 hours of attorneys' and law clerks' time spent in prosecuting this action. As compensation for the services rendered in this litigation, Irsfeld, Irsfeld & Younger requests $110,000 in attorneys' fees and $6,989.49 as reimbursement for out-of-pocket costs and expenses.[83] The applicant has filed the necessary and appropriate underlying documentation in support of the requested fee.

■ Based upon a careful review of the services rendered by this firm, as reflected

---

79. Except for approximately 50 hours spent on the preparation of the fee application.

80. As was the case with certain other counsel, this law firm filed, on August 22, 1977, a supplemental request for reimbursement of expenses. Since a subsequent order of the Court will be issued, no award will be made at this time.

81. Except for 8.6 hours spent by Mr. Colden in preparing this fee application.

82. Equity Funding Capital Corporation, N.V. was a Netherland Antiles wholly-owned subsidiary of a Delaware wholly-owned subsidiary of EFCA.

83. The applicant has failed to file any underlying documentation in support of the request for reimbursement of expenses, but rather, merely filed an itemization of such expenses; therefore, no reimbursement can be made at this time. The applicant may reapply, within 20 days from the date below and file the supporting documentation.

in the fee application, and upon consideration of the comments in support of their fee application, the Court finds it fair, just and reasonable to award fees to the law firm of Irsfeld, Irsfeld & Younger in the amount of $22,608.25. This composite amount is the result of multiplying partners', associates', and law clerks' reasonable, historic hourly rates by a multiple of one.

Two points must be made about this fee award. First, the Court finds it unreasonable to apply any multiplier to the lodestar computed for this applicant. Although there may have been some risk in March, 1976 regarding the *amount* of the recovery to the plaintiffs represented by this applicant, there was virtually no risk, in light of the substantial work performed by others, that no recovery would be achieved. In this regard, the Court views this applicant as being in a similar position as the applicant in *City of Detroit v. Grinnell Corporation*, Nos. 76–7252, 76–7253, 76–7254 (2d Cir. 1977) ("*Grinnell II*"). The applicant "could not have been in suspense for any appreciable length of time." *Grinnell II*, 560 F.2d at 1101.

Second, the Court finds that the efforts of this firm benefited solely the members of the class it represented, Settlement Class A; therefore, the Court will order that this fee be paid directly from the settlement fund established for the members of Settlement Class A.

## 12. *Bader & Bader*

Neither Mr. Maximilian Bader, nor Mr. I. Walton Bader, nor Mr. Milton Bader, nor Mr. Benedict Bader, the members of this law firm, were appointed by the Court as members of the Plaintiffs' Steering Committee in this litigation. Mr. I. Walton Bader was, however, an attorney of record in this case and participated in the litigation in certain limited respects. The record indicates that his main contribution to the

litigation, aside from suggestions rendered at Steering Committee meetings, was to develop the theory of liability against First National City Bank, a defendant which was dismissed from the case at the summary judgment stage.

In its original application, filed February 28, 1977, the applicant seeks compensation for a total of 570 hours spent in litigating this case. For these efforts the applicant requests $100,000 in attorneys' fees and $7,500 as reimbursement for out-of-pocket costs and expenses. In a supplemental application, filed on May 17, 1977, the applicant seeks an additional $10,400 in attorneys' fees and $1,200 as reimbursement of further out-of-pocket costs and expenses. All of the efforts of the firm of Bader & Bader were expended by Mr. I. Walton Bader.

Based upon a careful review of the services rendered by this firm, as reflected in both the original and supplemental fee applications and upon consideration of both the objections to [84] and the comments in support of their application, the Court finds it fair, just and reasonable to award fees to the law firm of Bader & Bader in the amount of $19,110.00 and to award the amount of $2,000 as reimbursement for the reasonable amount of out-of-pocket costs and expenses incurred by this applicant. The composite amount awarded as reasonable attorneys' fees to this applicant is the result of multiplying Mr. Bader's reasonable number of hours spent by the approximate weighted-average historic hourly rate of $65 per hour.[85]

The Court finds that this applicant is one of those counsel who remained on the sidelines during much of the litigation and did not assume primary responsibility for major aspects of the case; therefore, it would be unreasonable to apply any multiplier to the lodestar computed for this applicant. *See Grinnell II, supra.*

**84.** The State Teachers Retirement Board of the State of Ohio filed detailed objections to this application and others.

**85.** Although Mr. Bader failed to supply direct evidence of his historic hourly rate, the reasonable rate of $65 per hour was the result of consideration of his fee applications in other cases and the historic hourly rate of other counsel of like experience and expertise.

■ Furthermore, substantial reductions have been made in the hours claimed by counsel because (a) the applicant seeks compensation at a premium rate for his travel time; (b) many of the efforts of this counsel were duplicative and overlapping of the work done by other counsel; (c) some of Mr. Bader's efforts benefited solely his private clients and were of little, or no, benefit to the members of the classes in this litigation; and (d) numerous of the requested hours were spent in connection with the preparation and presentation of the fee application.

13. *Joseph H. Ruskay*

In 1973, Mr. Ruskay filed a lawsuit, in the Southern District of New York, on behalf of former stockholders of Bankers National Life Insurance Company who had exchanged their Bankers stock for shares of EFCA in October, 1971. Since 1973, in addition to prosecuting the claims on behalf of the Bankers class, Mr. Ruskay has rendered valuable assistance to the Plaintiffs' Steering Committee and, specifically, Mr. Paul Bernstein. His major area of responsibility involved assisting Mr. Bernstein on the discovery of the claims against the underwriter defendants, Bache & Co., Inc. and New York Securities Co., Inc. Despite the fact that the EFCA Trustee had concluded in his report that these defendants "could only have discovered the fraud by blind luck," these defendants have contributed $3 million to the settlement fund.

The applicant rightly admits that he did not take a principal role in this litigation and, in connection with the prosecution of the claims against the underwriters, his participation was secondary to that of Mr. Bernstein's. Mr. Ruskay, therefore, seeks no multiplier of his basic lodestar fee and

seeks compensation for his efforts expended in reviewing work performed by others at the hourly rate of $25.00.

The applicant seeks compensation for a total of 852 hours of attorneys' time spent in prosecuting this action. All efforts for which compensation is sought were expended by Mr. Ruskay. As compensation for the services rendered in this litigation, Joseph A. Ruskay requests $91,991 in attorneys' fees and $20,706.43, as reimbursement for out-of-pocket costs and expenses.[86] Mr. Ruskay has filed all the necessary and appropriate underlying documentation in support of the requested fee.

■ Based upon a careful review of the services rendered by this applicant, as reflected in the fee application, and upon consideration of both the objections to and the comments in support of the application, the Court finds it fair, just and reasonable to award fees to Joseph A. Ruskay in the amount of $53,800.00 and $10,075.02 as reimbursement of out-of-pocket costs and expenses. The composite amount awarded as reasonable attorneys' fees to this applicant is the result of multiplying Mr. Ruskay's reasonable number of hours spent by the approximate weighted-average historic hourly rate of $75 per hour.[87]

Reductions have been made in the hours claimed by this applicant because (a) some of the efforts expended were duplicative of work done by other counsel and produced no benefit to the plaintiffs, and (b) compensation is not awarded for time spent in preparing the fee application.

14. *Nemser & Nemser*

Although this firm was counsel for certain named plaintiffs in this litigation, its

---

**86.** The sum of $20,483.34 was requested in Mr. Ruskay's initial application, while a subsequent application, filed May 20, 1977 sought reimbursement of an additional $223.09 in expenses. The Court, by Order, filed July 29, 1977, awarded Mr. Ruskay $10,408.32 as partial reimbursement for his out-of-pocket costs and expenses; therefore, that sum will be deducted from his request. Furthermore, since all costs and expenses contained in Mr. Rus-

kay's May 20 filing ($223.09) relate to his application for counsel fees, no award will be allowed on the May 20 application.

**87.** Although Mr. Ruskay failed to supply direct evidence of his historic hourly rate, the reasonable rate of $75 per hour was the result of consideration of his fee applications in other cases and the historic hourly rate of other counsel in this litigation.

activities were generally secondary in nature and limited in scope. The one possible exception was the preparation at the behest of the Plaintiffs' Steering Committee, of a comprehensive report entitled "Analysis of Fraud Class (Open Market Purchases.")" This document detailed the trading history of EFCA and it proved helpful in both the reorganization proceedings and these M.D.L. proceedings. The record also indicates that, on occasion, this applicant rendered assistance to the attorney who possessed primary responsibility for the trading cases, Mr. Philip Jones.

The law firm seeks compensation for a total of 369 hours of attorneys' time spent prosecuting this action. As compensation for the services rendered in this litigation, Nemser & Nemser requests $80,000 in attorneys' fees and reimbursement of disbursements in the sum of $3,238.92. The applicant failed to adequately respond to the Court's Order, filed February 2, 1977 (*See* p. 1323, *supra*) in that it neglected to provide, among other things, copies of its time records in these M.D.L. proceedings and copies of its fee requests in other class action cases.

■ Based upon a careful review of the services rendered by this firm, as reflected in the fee application and upon consideration of both the objections to and the comments in support of the application, the Court finds it fair, just and reasonable to award attorneys' fees to Nemser & Nemser in the amount of $20,050.00 and reimbursement of costs and expenses in the sum of $1,500.00.

Reductions have been made in the hours claimed by this applicant because some of the efforts expended were duplicative of work done by other counsel and produced no discernible benefit to the members of the classes. Furthermore, since the Court finds that this applicant is one of those which remained on the sidelines during much of the litigation and did not assume primary responsibility for major aspects of the case, it would be unreasonable to apply any multiplier to the lodestar computed for this applicant.

### 15. *Philips & Mushkin, P. C.*

The activities of the members of this law firm consisted primarily of (a) discovery on claims against Chemical Bank, (b) research to ascertain the exact names and addresses of the various defendants in the trading cases, (c) attendance at various plaintiffs' counsels' meetings and conferences, and (d) review of documents. The time spent on the first two activities clearly benefited the members of the classes, while some time spent on the latter two activities was only marginally beneficial.

The applicant seeks compensation for a total of 493 hours of attorneys' time spent in prosecuting this action. Of these hours, 436 were spent by Mr. Philips, while 57 hours are an associate's time. As compensation for the services rendered in this litigation, Philips & Mushkin, P. C. requests $69,675.00 in attorneys' fees and $1,207.85 as reimbursement for out-of-pocket costs and expenses. The applicant has filed all the appropriate and necessary underlying documentation in support of the requested fee.

■ Based upon a careful review of the services rendered by this applicant, as reflected in the fee application, and upon consideration of the comments in support of the application, the Court finds it fair, just and reasonable to award fees to Philips & Mushkin, P. C. in the amount of $28,905.00 and $1,207.85 as reimbursement for out-of-pocket costs and expenses. The composite amount awarded as reasonable attorneys' fees to this applicant is the result of multiplying the reasonable number of hours spent by the approximate weighted-average historic hourly rates of $75 per hour for partners and $40 per hour for associates.

Reductions have been made in the hours claimed by this applicant because (a) some of the efforts expended were duplicative of work done by other counsel and produced no benefit to the members of the classes; (b) the applicant seeks compensation for his travel time at a premium rate; and (c) compensation is not awarded for time spent in preparing the fee application.

Finally, since the Court finds that this applicant is one of those which remained on the sidelines during much of the litigation and did not assume primary responsibility for major aspects of the case it would be unreasonable to apply any multiplier to the lodestar computed for this applicant.

### 16. *State Teachers Retirement Board of Ohio*

This application seeks compensation for counsel who represented the State Teachers Retirement Board of Ohio ("STRB"). Such counsel included members of the law firm of Arter & Hadden, special counsel for STRB and staff attorneys for the Attorney General of the State of Ohio. Although clearly these counsel expended efforts which solely benefited their individual client, STRB, the application indicates that "[t]he fee and expenses for which payment is sought hereunder are limited to those services rendered for the general benefit of all plaintiffs in this action."

The application further indicates that ". . . whatever amount allowed by this Court as compensation for the legal services rendered herein will be refunded to the State Teachers Retirement Board of Ohio."

The record indicates that counsel for STRB participated in this litigation in primarily four areas: First, assistance in determining the liability, coverage and policy limits of the insurers of certain defendants; second, reviewing and analyzing the accounting work papers of certain defendants; third, determination of whether to name EFCA's securities counsel as a defendant in these proceedings; and fourth, assistance in the discovery against Milliman & Robertson.

The applicant seeks compensation for a total of 989.25 hours of attorneys' time spent prosecuting this action. As compensation for the services rendered in this litigation, the applicant requests $64,232.20 in attorneys' fees and reimbursement of disbursements in the sum of $30,211.18. The applicant has filed all the necessary and required underlying documentation in support of its requested fee, except that the time records for the staff attorneys in the Office of the Ohio Attorney General are in "reconstructed form," since these attorneys do not maintain time records.

Based upon a careful review of the services rendered by this applicant, as reflected in the fee application, and upon consideration of the comments in support of the application, the Court finds it fair, just and reasonable to award attorneys' fees to STRB in the amount of $52,280.90 and reimbursement of costs and expenses in the sum of $15,000.00.[88]

### 17. *Shatzkin, Cooper, Labaton, Rudoff & Bandler*

The record in this case indicates four areas of participation by this applicant. First, this firm was an active member of the New York Steering Committee prior to transfer and consolidation of these cases by the JPML. Second, the firm was active in attempting to reach a stipulation in the trading cases regarding the underlying fraud at EFCA. Third, the applicant participated in the preparation of answers to interrogatories and the depositions of its client in these proceedings. Fourth, Shatzkin, Cooper took an active role in the discovery against Dishy, Easton & Co.

The law firm seeks compensation for a total of 275.75 hours of attorneys' time spent in prosecuting this action. Of this time, 219.75 hours were spent by Mr. Edward Labaton, a partner in the law firm. As compensation for the services rendered in this litigation, Shatzkin, Cooper, Labaton, Rudoff & Bandler request $56,270 in attorneys' fees and the sum of $7,517.11 as reimbursement for out-of-pocket costs and

---

88. Since the applicant failed to provide the appropriate underlying documentation to substantiate the requested reimbursement, the Court at this time, awards only that amount advanced to the Plaintiffs' Steering Committee. The applicant may reapply, within 20 days from the date below, for reimbursement if the necessary documentation is filed.

expenses.[89] The applicant has filed all the necessary and required underlying documentation in support of its fee request.

■ Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of the comments in support of the application, the Court finds it fair, just and reasonable to award fees to the law firm of Shatzkin, Cooper, Labaton, Rudoff & Bandler in the amount of $21,345.00 and reimbursement of costs and expenses in the amount of $4,000.00. The composite amount awarded as attorneys' fees to this applicant is the result of multiplying partners' reasonable, historic hourly rates and associates' reasonable, historic hourly rates by a multiple of one.[90] Since the Court finds that this applicant is one of those which remained on the sidelines during much of the litigation and did not assume primary responsibility for major aspects of the case, it would be unreasonable to apply any multiplier to the lodestar computed.

### 18. *Katz, Hoyt & Bell*

Although members of this law firm performed certain other tasks, the record indicates that the primary activity of this applicant was participation in the debriefing of Sam Lowell, an EFCA principal. No other activities were of benefit to the members of the classes in this litigation.

The law firm seeks compensation for a total of 266.46 hours of attorneys' time spent in prosecuting this litigation. As compensation for the services rendered in this litigation, Katz, Hoyt & Bell request $50,000.00 in attorneys' fees and the sum of $1,155.28 as reimbursement for out-of-pocket costs and expenses. The applicant has

filed all the necessary and appropriate underlying documentation in support of its fee request.

■ Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of both the objections to [91] and the comments in support of the application, the Court finds it fair, just and reasonable to award fees to the law firm of Katz, Hoyt & Bell in the amount of $16,331.25 and reimbursement of costs and expenses in the amount of $500.00.[92] The composite amount awarded as attorneys' fees to this applicant is the result of multiplying Mr. Stoll's reasonable, historic hourly rate by a multiple of one. Since the Court finds that the services performed by other members of this firm were of no benefit to the members of the classes in this litigation, no compensation is allowed for their time. Furthermore, since the Court finds that this applicant is one of those which remained on the sidelines during much of the litigation and did not assume primary responsibility for major aspects of the case, it would be unreasonable to apply any multiplier to the lodestar computed.

### 19. *Samuel Sebba*

Mr. Sebba possessed a unique position in this litigation. Mr. Sebba is a solicitor in England and has not been an attorney of record in these proceedings. It was, however, solely through his persistent efforts that the N. V. Securities Holders Class, ultimately represented by Irsfeld, Irsfeld & Younger, obtained any representation whatsoever in these proceedings. In obtaining such representation, Mr. Sebba clearly provided a benefit to the members

---

**89.** Of the $7,517.11 requested $942.11 was the subject of a previous application. The first application was ruled upon by the Court in its order, filed July 29, 1977.

**90.** No compensation or reimbursement is awarded for time spent or expenses incurred in the preparation or presentation of the fee application.

**91.** The State Teachers Retirement Board of Ohio filed an objection to this fee application.

**92.** Since the applicant failed to provide the appropriate underlying documentation to substantiate the requested reimbursement, the Court, at this time, awards only that amount advanced to the Plaintiffs' Steering Committee. The applicant may reapply, within 20 days from the date below, for reimbursement if the necessary documentation is filed.

of that class, if not to the members of the other classes in this case.

Mr. Sebba's application is as unusual as the position occupied by Mr. Sebba in this case. Virtually no underlying documentation is filed to either support the fee or the reimbursement sought. This is due, however, to the differences between American and English practice rather than any recalcitrance on Mr. Sebba's part.

 Based upon a careful review of the services rendered by Mr. Sebba, as reflected in the fee application, and upon consideration of the comments by Irsfeld, Irsfeld & Younger and Plaintiffs' Liaison Counsel in support of the application, the Court finds it fair, just and reasonable to award fees to Samuel Sebba in the amount of $7,500.00 and reimbursement of costs and expenses in the reasonable amount of $1,750.00.[93]

Since, as was the case with Irsfeld, Irsfeld & Younger, the Court finds that the efforts of Mr. Sebba benefited solely the members of Settlement Class A, the Court will order that this fee be paid directly from the settlement fund established for the members of Settlement Class A.

### 20. McDermott, Will & Emery

Although this law firm acted primarily as private counsel for an individual plaintiff in these proceedings, the Trustees of Jewel Companies Investment Trust, many of the efforts expended by its members benefited the members of the class as well as its private client. The assistance of this law firm in these proceedings was necessitated by the fact that it represented a substantial claimant in these proceedings.[94] During the evidentiary hearings on May 10 and 11, Plaintiffs' Liaison Counsel acknowledged the substantial assistance rendered by this applicant. During this same hearing, the applicant admitted that the class can only be required to pay for services rendered which benefited it and not for services which benefited solely a private client; however, the applicant contended that its fee application had been drafted with that principle in mind and that compensation was only sought for those services which directly benefited the members of the classes in this litigation.

 The law firm seeks compensation for a total of 339 hours of attorneys' and law clerk's time spent in prosecuting this action. As compensation for the services rendered in this litigation, McDermott, Will & Emery request $33,900.00 in attorneys' fees and the sum of $12,475.25 as reimbursement for out-of-pocket costs and expenses. Thus, the firm seeks $100 per hour for every hour spent, despite the fact that 261.75 hours were spent by an associate whose historic hourly rate during the relevant period was $65 and that ten hours were spent by a law clerk.

Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of the comments in support of the application, the Court finds it fair, just and reasonable to award fees to the firm of McDermott, Will & Emery in the amount of $21,475.70 and the sum of $10,000 as reimbursement for out-of-pocket costs and expenses. The composite amount awarded as attorneys' fees to this applicant is the result of multiplying partners' and associates' reasonable, historic hourly rates, and the law clerk's reasonable rate of $20 per hour, by a multiple of one.

Reductions have been made in the hours claimed by this applicant because (a) some of the efforts for which compensation is sought were duplicative of work done by other counsel and produced no benefit to the members of the classes, and (b) some of the work for which compensation is sought benefited solely the applicant's private

---

93. The Court finds Mr. Sebba's reasonable expenses to be the cost of one round-trip from London to California and the approximate cost of ten long distance telephone calls.

94. The record indicates that the collapse of EFCA in 1973 left the Jewel Trust with losses of $1,685,282.22 paid for 41,100 shares of EFCA common stock, $167,526.31 on sales of EFCA common stock and $1,200,000 paid for EFCA 5¼% debentures.

client. Furthermore, since the Court finds that this applicant is one of those which remained on the sidelines during much of the litigation and did not assume primary responsibility for major aspects of the case, it would be unreasonable to apply any multiplier to the lodestar computed for this applicant.

### 21. *Frieman, Rosenfeld & Zimmerman*

This law firm represented the holders of EFCA 9½% debentures since September, 1974, when the initial counsel for that class withdrew from the case. Although much of the time spent by the members of this firm consisted of merely reviewing the work done by other counsel and although this firm was one of those which remained on the sidelines during much of the litigation and did not assume primary responsibility for major aspects of the case, some of the efforts expended by this applicant benefited members of the classes in this litigation.

The law firm seeks compensation for a total of 128.8 hours of attorneys' time spent in prosecuting this action. As compensation for the services rendered in this litigation, Frieman, Rosenfeld & Zimmerman request $19,000.00 in attorneys' fees and $931.71 as reimbursement for out-of-pocket costs and expenses. Additionally, the applicant requests $4,000.00 in attorneys' fees for the time spent in representing the members of this class in the EFCA Reorganization Proceedings. *See In re Equity Funding Corporation of America Securities Litigation,* 416 F.Supp. 132 (C.D.Cal.1975). Since this Court obviously lacks jurisdiction over those proceedings, no award will be allowed for the time expended in those proceedings. The applicant has filed all the necessary and required underlying documentation in support of its fee request.

Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of the comments during the evidentiary hearing regarding the application, the Court finds it fair, just and reasonable to award fees to the law firm of Frieman, Rosenfeld & Zimmerman in the amount of $6,182.40.[95] This composite amount is the result of multiplying the reasonable amount of hours expended by the reasonable hourly rate of $60 per hour.

Reductions have been made in the hours claimed by this applicant because some of the efforts for which compensation is sought were duplicative of work done by other counsel and produced no benefit to the members of the classes. Furthermore, since the Court finds that this applicant is one of those which remained on the sidelines during much of the litigation and did not assume primary responsibility for major aspects of the case, it would be unreasonable to apply any multiplier to the lodestar computed for this applicant.

### 22. *Pryor, Cashman, Sherman & Flynn*

This applicant, like McDermott, Will & Emery, represented private plaintiffs in this litigation; however, as was the case with McDermott, Will & Emery, some of the efforts of this law firm benefited not only its private clients but the members of the classes as well. Plaintiffs' Liaison Counsel acknowledged, during the evidentiary hearing, the benefits conferred by this applicant.

The law firm seeks compensation for a total of 135.50 hours of attorneys' time spent prosecuting this action. As compensation for the services rendered in this litigation, Pryor, Cashman, Sherman & Flynn requests $13,973.70 in attorneys' fees and $5,533.83 as reimbursement of out-of-pocket costs and expenses.[96] The applicant has

---

**95.** Since the applicant has failed to file the underlying documentation in support of the requested reimbursement for costs and expenses, no award can be made at this time. The applicant can, however, reapply within 20 days from the date below.

**96.** Of the $5,533.83 requested, $4,684.60 was awarded to the applicant by Order of the Court dated July 29, 1977. Thus, reimbursement is actually sought in the amount of $849.23. The applicant has filed all necessary underlying documentation in support of this requested amount.

filed all the necessary and required underlying documentation in support of its fee request.

◼ Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of the comments in support of the application, the Court finds it fair, just and reasonable to award fees to the law firm of Pryor, Cashman, Sherman & Flynn in the amount of $12,591.45 and reimbursement of out-of-pocket costs and expenses in the amount of $849.23.

Reductions have been made in the hours claimed by this applicant because some of the efforts for which compensation is sought were duplicative of work done by other counsel and produced no benefit to the members of the classes.

### 23. *Phillips, Nizer, Benjamin, Krim & Ballon*

Although most of the activities of the members of this law firm occurred in New York prior to transfer and consolidation of these cases, some of the efforts expended provided a benefit to the members of the classes in this litigation. The applicant was an active member of the New York Steering Committee.

The law firm seeks compensation for a total of 133.25 hours of attorneys' time spent prosecuting this action. As compensation for the services rendered in this litigation, Phillips, Nizer, Benjamin, Krim & Ballon requests $8,606.00 in attorneys' fees and $3,750.21 as reimbursement for out-of-pocket costs and expenses.[97]

◼ Based upon a careful review of the services rendered by this firm, as reflected in the fee application, and upon consideration of the comments during the evidentiary hearing regarding the application, the Court finds it fair, just and reasonable to award fees to the law firm of Phillips, Nizer, Benjamin, Krim & Ballon in the amount of $3,819.80. This composite amount is the result of multiplying the reasonable number of hours spent by the reasonable, historic hourly rates of counsel.

Reductions have been made in the hours claimed by this applicant because some of the efforts for which compensation is sought were duplicative of work done by other counsel and produced no benefit to the members of the classes. Furthermore, since the Court finds that this applicant is one of those which remained on the sidelines during much of the litigation and did not assume primary responsibility for major aspects of the case, it would be unreasonable to apply any multiplier to the lodestar computed for this applicant.

24. *Nine Firms*: (a) Kirsch, Arak & Bulmash; (b) Steinhaus & Hochhauser; (c) James P. Chapman; (d) Much Shelist Freed Denenberg & Ament, P. C.; (e) DiFalco, Field & Lomenzo; (f) Demov, Morris, Levin & Shein; (g) Chapman & Cutler; (h) Bachner, Tally & Mantell; and (i) Law Offices of Alvin B. Green.

◼ The Court finds no basis in fact for the claims that these applicants rendered services that benefited the members of the classes involved in this litigation or contributed to the settlement fund; therefore, each of their applications for attorneys' fees is denied.

◼ Certain of these counsel advanced monies to the Plaintiffs' Steering Committee to defer costs and expenses incurred during this litigation. The sums so advanced must be repaid to these counsel from the settlement fund. It will, therefore, be ordered that the following sums be paid to the following applicants as reimbursement of sums advanced to Plaintiffs'

**97.** Of the $3,750.21 requested, $3,524.88 was the subject of a previous application. Since a subsequent order will be issued by the Court, no award for costs and expenses is allowed at this time.

Steering Committee: (a) Kirsch, Arak & Bulmash—$2,000; (b) Chapman & Cutler—$5,000; and (c) Bachner, Tally & Mantell—$5,000.

25. *Jones, Day, Reavis & Pogue and Hirschler, Fleischer, Weinberg, Cox & Allen*

These two firms apply to the Court for reimbursement of $10,000 and $15,000 respectively, for sums advanced to the Plaintiffs' Steering Committee to defer costs and expenses incurred during this litigation. The sums so advanced must be repaid to these counsel from the settlement fund; therefore, it will be ordered that $10,000 be paid to Jones, Day, Reavis & Pogue and $15,000 be paid to Hirschler, Fleischer, Weinberg, Cox & Allen as reimbursement for amounts advanced to the Plaintiffs' Steering Committee.

## V. CONCLUSION

The Court has considered all of the pleadings, oral arguments and testimony submitted by counsel and has analyzed the nature of this litigation, the time and labor properly spent, the quality of the services rendered by counsel, the scope and complexity of the issues involved and the financial risk and contingent nature of the action undertaken, and has concluded that attorneys' fees and reimbursements of costs as follows would be fair, just and reasonable and must be ordered paid from the settlement fund:

| FIRM | FEES | EXPENSES |
|---|---|---|
| Schwartz, Alschuler & Grossman | $1,718,219.37 | $ 44,459.28 |
| Corinblit & Shapero | 1,394,034.37 | 10,210.23 |
| Wolf Popper Ross Wolf & Jones | 713,597.50 [98] | –0– |
| Kreindler & Kreindler | 800,679.37 | –0– |
| David B. Gold | 230,540.00 | –0– |
| Feinerman, Furman & Klein | 6,650.00 | –0– |
| Milberg & Weiss | –0– | –0– |
| Kohn, Savett, Marion & Graf, P. C. | 383,208.75 | –0– |
| Fine, Kaplan and Black | 413,063.75 | 23,316.99 |
| Sachnoff Schrager Jones & Weaver, Ltd. | 298,479.36 | –0– |
| Kass, Goodkind, Wechsler & Gerstein | 264,550.62 | –0– |
| Diamond, Tilem & Colden | 80,613.00 | –0– |
| Irsfeld, Irsfeld & Younger | 22,608.25 [99] | –0– |
| Bader & Bader | 19,110.00 | 2,000.00 |
| Joseph H. Ruskay | 53,800.00 | 10,075.02 |
| Nemser & Nemser | 20,050.00 | 1,500.00 |
| Philips & Mushkin | 28,905.00 | 1,207.85 |
| State Teachers Retirement Board of Ohio | 52,280.90 | 15,000.00 |
| Shatzkin, Cooper, Labaton, Rudoff & Bandler | 21,345.00 | 4,000.00 |
| Katz, Hoyt & Bell | 16,331.25 | 500.00 |
| Samuel Sebba | 7,500.00 [100] | 1,750.00 |
| McDermott, Will & Emery | 21,475.70 | 10,000.00 |
| Kirsch, Arak & Bulmash | –0– | 2,000.00 |
| Frieman, Rosenfeld & Zimmerman | 6,182.40 | –0– |
| Steinhaus & Hochhauser | –0– | –0– |
| Pryor, Cashman, Sherman & Flynn | 12,591.45 | 849.23 |
| James Chapman | –0– | –0– |
| Much, Shilist, Freed, Denenberg & Ament | –0– | –0– |
| Phillips, Nizer, Benjamin, Krim & Ballon | 3,819.80 | –0– |
| DiFalco, Field & Lomenzo | –0– | –0– |
| Demov, Morris, Levin & Shein | –0– | –0– |
| Chapman & Cutler | –0– | 5,000.00 |
| Bachner, Tally & Mantell | –0– | 5,000.00 |
| Alvin B. Green | –0– | –0– |
| Jones, Day, Reavis & Pogue | –0– | 10,000.00 |
| Hirschler, Fleischer, Weinberg, Cox & Allen | –0– | 15,000.00 |
| TOTALS | $6,589,635.84 | $161,868.60 |

**98.** It is hereby Ordered that $535,198.12 of this amount be paid directly from the $4 million fund established in the trading cases. The remaining $178,399.37 is to be paid from the remaining settlement fund.

**99.** It is hereby Ordered that this amount be paid directly from the settlement fund established for the members of Settlement Class A.

**100.** It is hereby Ordered that the attorneys' fees and expenses awarded to Mr. Sebba be paid directly from the settlement fund established for the members of Settlement Class A.

Plaintiffs' Liaison Counsel is directed to prepare forthwith separate judgments awarding attorneys' fees and expenses to each of the attorneys and entities in accordance with the above-stated amounts. If an appeal is taken by any applicant, it is the intention of this Court that such an appeal be an individual appeal which will not delay payment to other applicants.

The Court is aware of no just reason for delaying the entry of final appealable judgments for the awards of attorneys' fees and costs as set forth above. Upon approval of said judgments, the Court shall direct entry of final judgment thereon in accordance with the provisions of Rule 54(b) of the Federal Rules of Civil Procedure such that any appeals therefrom shall be taken immediately pursuant to Rule 4(a) of the Rules of Appellate Procedure. This opinion contains and shall constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

Notices of entry of the final judgments ·shall be mailed to all attorneys who have submitted petitions for award of attorneys' fees and expenses.

IT IS SO ORDERED.